**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| TOMMY HARRIS, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DURHAM ENTERPRISES, INC. and DON DURHAM, | ) | No. 3:20-CV-00072-JPG |
| | ) | |
| Defendants/Crossclaim Plaintiffs/ | ) | Honorable J. Phil Gilbert |
| Crossclaim Defendants, | ) | |
| | ) | |
| and | ) | CJRA Track: B |
| | ) | |
| LIBERTY MUTUAL INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant/Crossclaim Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| OHIO SECURITY INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff/ | ) | |
| Crossclaim Plaintiff/ | ) | |
| Crossclaim Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE OHIO CASUALTY INSURANCE COMPANY, | ) | |
| | ) | |
| Intervenor Defendant/Crossclaim | ) | |
| Plaintiff/Counterclaim Plaintiff. | ) | |

**INSURER-DEFENDANTS' RESPONSES TO**
**DEFENDANTS DON DURHAM AND DURHAM ENTERPRISE, INC.'S**
**AND DEFENDANT TOMMY HARRIS' STATEMENTS OF FACT**
**IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT**

The Insurer-Defendants[1] respond to the statements of fact filed by Harris and the Durham Defendants as follows:

Section I of this document responds to the Durham Defendants statement of facts.  Section II of this document responds to Harris's statement of facts.  The Insurer-Defendants also set forth below two general objections in response to many of the purported statements of fact asserted by the Durham Defendants and Harris.

*First*, a number of the facts asserted by Harris and the Durham Defendants cite testimony where the witness states that they do not recall whether or not they took a certain action.  A lack of recollection (that is not refreshed in other parts of the deposition) does not create an issue of material fact on a given issue.  *See, e.g.*, *G&G Closed Cir. Events, LLC v. Castillo*, No. 14-CV-02073, 2017 WL 1079241, at *7 (N.D. Ill. Mar. 22, 2017) ("A witness's inability to recall something will not create a fact issue in the face of affirmative evidence of the fact."); *Rocket v. Marten Transp. Ltd.*, No. 99 C 3957, 2001 WL 1155256, at *6 (N.D. Ill. Sept. 28, 2001) (failure to recall instances of misconduct do not create a genuine issue of material fact that would defeat a motion for summary judgment).

*Second*, a significant number of "facts" asserted by Harris and the Durham Defendants are not facts at all.  Instead, they are legal conclusions offered by the witness in response to plainly objectionable questions.  The Court should disregard all such legal conclusions.  *See, e.g.*, *Spivey v. Love*, No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3 (S.D. Ill. May 13, 2013) (disregarding legal conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL

---

[1]     Unless otherwise noted, all defined terms herein have the same meaning as set forth in the Insurer-Defendants' Motion for Summary Judgment and Memorandum in Support Thereof.  *See* Dkt. No. 106.

4233659 (S.D. Ill. Sept. 6, 2019) (refusing to consider statements of fact containing legal

conclusions on motion for summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F.

Supp. 2d 764, 771 (N.D. Ill. 2012) (noting, on a motion for summary judgment, that "[w]here a

party offers a legal conclusion or statement of fact without proper evidentiary support, the Court

will not consider that statement.").

## I.   RESPONSES TO THE DURHAM DEFENDANTS STATEMENT OF UNCONTROVERTED FACTS ("SOF")

### A.   Relationship Between Durham Defendants And Insureds Defendants

<u>Durham SOF No. 1:</u>   Don Durham, as the owner/operator of Durham Enterprises, Inc.
d/b/a City Wide Maintenance of St. Louis, had purchased a Commercial Policy, policy number
BKS57078432, from Ohio Security Insurance/Liberty Mutual Insurance Company (hereinafter
"Liberty Mutual"effective December 30, 2015, until December 30, 2016 ("Ohio Security Policy").
(Exhibit B, Ohio Security Policy; Exhibit C, Ohio Security Answer, p. 5).

**RESPONSE:** Denied that Liberty Mutual issued the Ohio Security Policy.  The

Ohio Security Policy, the affidavit attached thereto, and the denial letter sent to the Durham

Defendants, all state that Ohio Security—not Liberty Mutual—was the underwriter of the Ohio

Security Policy.  See SUF ¶ 49.2  Neither of the exhibits cited in Paragraph 1 support the assertion

that the Ohio Security Policy was issued by Liberty Mutual.

Admitted that Ohio Security issued to the named insured "DURHAM ENTERPRISES

DBA CITY WIDE OF ST LOUIS" a commercial package insurance policy,

No. BKS (16) 57 07 84 32, effective December 30, 2015, until December 30, 2016.

<u>Durham SOF No. 2:</u>   The Ohio Security Policy contained a duty to defend, in that it stated:

> "We will pay those sums that the insured becomes legally obligated to pay as
> damages because of "bodily injury" or "property damage" to which this insurance
> applies. We will have the right and duty to defend the insured against any "suit"
> seeking those damages for bodily injury" or "property damage" to which insurance
> does not apply."  (Exhibit B, Ohio Security Policy. OSIC0173).

---

2        References to "SUF ¶ __" refer to the Insurer-Defendants' Statement of Undisputed Material Facts.
*See* Dkt. No. 106-1.

2

**RESPONSE:** Admitted that this allegation accurately quotes an excerpt from the Ohio Security Policy.  Ohio Security further responds that the Ohio Security Policy's "FUNGI OR BACTERIA EXCLUSION" provides:

> This insurance does not apply to:
>
> **Fungi or Bacteria**
>
> a.     "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.
>
> b.     Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.
>
> This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption. . . .

SUF ¶ 15.

## B.     History Of Harris Claims

<u>Durham SOF No. 3</u>:   Durham Enterprises, Inc. d/b/a City Wide Maintenance of St. Louis was performingjanitorial services at a dialysis center, owned by Renal Life Link Inc. d/b/a Metro East Dialysis and Davita, Inc., from December 30, 2015, until December 30, 2016. (Exhibit A, Order and Judgment of the Circuit Court Twentieth Judicial Circuit St. Clair County, Illinois "Trial Court" in the case of Tommy Harris Plaintiff v. Durham Enterprises, Inc. and Don Durham Defendants Case Number 19-L-0234 (hereinafter referred to as "Judgment"), p. 1).

**RESPONSE:** Admitted that Paragraph 3 accurately quotes an excerpt from the October 9, 2019 Judgment entered by the St. Clair County trial court.

<u>Durham SOF No. 4</u>:   On January 10, 2017, Harris filed a Complaint against Renal Life Link Inc. d/b/aMetro East Dialysis and Davita, Inc. alleging various theories of medical negligence (case number 17-L-7) for causing Harris to suffer numerous infections while undergoing dialysis. (Exhibit A, Judgment, p. 4).

**RESPONSE:** Admitted that Paragraph 4 accurately quotes an excerpt from the October 9, 2019 Judgment entered by the St. Clair County trial court.

3

Durham SOF No. 5:   On April 19, 2017 Harris filed a First Amended Complaint adding City Wide Maintenance of St. Louis as a defendant alleging it negligently and carelessly failed to properlyclean said dialysis center causing plaintiff to suffer numerous infections. The Complaint and Amended Complaints did not allege damages as a result of bacterial infections. (Exhibit A, Judgment, p. 4).

**RESPONSE:** Admitted that Paragraph 5 accurately quotes an excerpt from the October 9, 2019 Judgment entered by the St. Clair County trial court.  Denied that the FAC did not allege damages as a result of bacterial infections.  The Certificate of Merit, which was attached to, and filed with the FAC—as required by 735 Ill. Comp. Stat. Ann. 5/2-622—asserted that Harris was "at [a] significantly increased risk of bacterial sepsis" and that Harris was ultimately "diagnosed with both gram positive and gram negative sepsis."  SUF ¶ 8.

Durham SOF No. 6:   On May 5, 2017, City Wide Maintenance of St. Louis was served with a copy of the First Amended Complaint, and Don Durham provided Liberty with a copy of the First AmendedComplaint.  (Exhibit D, First Amended Complaint; Exhibit C, Ohio Security Answer, p. 5).

**RESPONSE:** Admitted that Durham was served with a copy of the FAC on May 5, 2017, and that he provided the FAC to an employee of Liberty Mutual.  Denied that Liberty Mutual issued the Ohio Security Policy.  *See* SUF ¶ 49.  Further denied that the individuals who evaluated the Durham Defendants' request for a defense and indemnity were working on behalf of Liberty Mutual.  As the Insurer-Defendants' corporate representative stated, he and his colleagues who evaluated the claim were "working on behalf [of] Ohio Security, the underwriting company," while they were evaluating the Durham Defendants' request. Ex. G at 11:19–25.[3]

Durham SOF No. 7:   On October 17, 2017, Harris filed his Second Amended Complaint adding Durham Enterprises, Inc. as a defendant alleging it negligently and carelessly failed to properly clean said dialysis center. (Durham Enterprises was doing business as City Wide Maintenance of St. Louis,a registered fictitious name).  (Exhibit A, Judgment, p. 5).

---

[3]      References to "Ex. __ " refer to the exhibits attached to the Declaration of Peter F. O'Neill in Support of the Insurer-Defendants' Motion for Summary Judgment and Memorandum in Support Thereof. *See* Dkt. Nos. 106-3–106-20.

4

**RESPONSE:** Admitted that Paragraph 7 accurately quotes an excerpt from the October 9, 2019 Judgment entered by the St. Clair County trial court. The Insurer-Defendants further state that the Second Amended Complaint was never provided to either Ohio Security or Liberty Mutual. Ex. H at Resp. to Req. for Admission No. 4.

Durham SOF No. 8:  On August 15, 2018, plaintiff filed a Fifth Amended Complaint adding Don Durhamas a defendant alleging he negligently and carelessly failed to properly clean dialysis center. (Exhibit A, Judgment, p. 5).

**RESPONSE:** Admitted that Paragraph 8 accurately quotes an excerpt from the October 9, 2019 Judgment entered by the St. Clair County trial court. The Insurer-Defendants further state that the Fifth Amended Complaint was never provided to either Ohio Security or Liberty Mutual. Ex. H at Resp. to Req. for Admission No. 7.

Durham SOF No. 9:  There were various additional amended complaints filed by Harris, but the allegationsagainst City Wide Maintenance of St. Louis, Durham Enterprises, Inc. and Don Durham – negligently and carelessly failed to properly clean said dialysis center – were never amended oraltered.  (Exhibit A, Judgment, p. 5).

**RESPONSE:** Admitted that Paragraph 8 accurately quotes an excerpt from the October 9, 2019 Judgment entered by the St. Clair County trial court. The Insurer-Defendants further state that the no pleadings other than the FAC were ever provided to either Ohio Security or Liberty Mutual. *See generally* Ex. H).

Durham SOF No. 10:  On December 5, 2015, Plaintiff Harris ("Harris") had a right internal jugular tunneled hemodialysis catheter placed by Dr. Coates at St. Elizabeth's for undergoing dialysis at said not functioning.  Dr. Coats replaced the right internal jugular tunneled hemodialysis catheterin a different location and also created a left upper extremity brachiocephalic arteriovenous fistula for use at a later date. Harris was discharged the same day. (Exhibit A, Judgment, pp. 2- 3).

**RESPONSE:** Admitted that Paragraph 10 accurately quotes an excerpt from the October 9, 2019 Judgment entered by the St. Clair County trial court.

Durham SOF No. 11:  Harris was admitted to Memorial Medical Center with sepsis secondary to an infected dialysis catheter. Dr. Neville performed surgery to remove the right internal jugularcatheter and a new tunneled dialysis catheter was placed and IVC venogram was performed.(Exhibit A, Judgment, p. 2).

**RESPONSE:** Admitted that Paragraph 11 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court.

Durham SOF No. 12:  Harris was admitted to Memorial Hospital with an infected catheter, and Dr. Coats performed surgery to remove the catheter. Dr. Coats performed surgery and placed a right common femoral vein temporary hemodialysis catheter.  Dr. Coats performed surgery and placed a left internal jugular tunneled hemodialysis catheter, a left upper extremity fistulogram, and a right femoral vein temporary hemodialysis catheter. During the hospitalization, he developed large pleural effusion.  (Exhibit A, Judgment, p. 2).

**RESPONSE:** Admitted that Paragraph 12 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court.

Durham SOF No. 13:  On July 3, 2016, Harris presented himself to Memorial Hospital emergency department for assistance dressing his dialysis access catheter.  (Exhibit A, Judgment, p. 2).

**RESPONSE:** Admitted that Paragraph 13 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court.

Durham SOF No. 14:  On August 5, 2016, Harris was admitted to Memorial Hospital with a left sided permanent catheter infection.  Dr. Moosa performed surgery to remove the infected permacath catheter.  At this time, the left upper arm fistula was being used for dialysis.  He was discharged on August 13, 2016.  (Exhibit A, Judgment, p. 3).

**RESPONSE:** Admitted that Paragraph 14 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court.

Durham SOF No. 15:  Each time Harris had a catheter removed or replaced, it left a visible scar. Plaintiff has visible scars on his chest and groin which are depicted in photographs admitted into evidence. (Exhibit A, Judgment, p. 3).

**RESPONSE:** Admitted that Paragraph 15 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court.

Durham SOF No. 16:  Between February 8, 2016, and August 5, 2016, Harris suffered a series of infections and infection related complications.  (Exhibit A, Judgment, p. 6).

**RESPONSE:** Admitted that Paragraph 16 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court.  The Insurer-Defendants

further state that Harris's expert testified that Harris's infections were bacterial infections.  SUF

¶ 40.

    <u>Durham SOF No. 17:</u> On February 8, 2016, Harris developed signs and symptoms of infection.  (ExhibitA, Judgment, p. 7).

        <u>**RESPONSE:**</u>  Admitted that Paragraph 17 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court.  The Insurer-Defendants

further state that Harris's expert testified that Harris's infections were bacterial infections.  SUF

¶ 40.

    <u>Durham SOF No. 18:</u> On February 20, 2016, Harris was admitted to St. Elizabeth's for sepsis secondary to an infected dialysis catheter. He had surgery to remove the catheter.  A temporary right femoral vein catheter was placed in Harris on February 22, 2016, by Dr. Robert Lee. Harris had surgery to replace the temporary catheter with a right internal jugular tunnel catheter on February29, 2016, by Dr. Robert Lee. Harris was discharged on March 1, 2016. (Exhibit A, Judgment, p.7).

        <u>**RESPONSE:**</u>  Admitted that Paragraph 18 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court.

    <u>Durham SOF No. 19:</u>  On March 11, 2016, Harris was admitted to St. Elizabeth's because his right internal jugular tunneled dialysis catheter was not functioning correctly. Harris was taken to surgery by Dr. Lee and the catheter was stripped using 20 mm snare. Harris went into flash pulmonary edema and was taken to dialysis right after and 3 liters of fluid drained.  Harris was discharged on March 12, 2016.  (Exhibit A, Judgment, p. 7).

        <u>**RESPONSE:**</u>  Admitted that Paragraph 19 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court.

    <u>Durham SOF No. 20:</u>  On March 22, 2016, Harris presented at Memorial Medical Center because the tunneled hemodialysis catheter placed by Dr. Lee was patients and staff. (Exhibit A, Judgment,p. 7).

        <u>**RESPONSE:**</u>  Admitted that Paragraph 20 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court.

    <u>Durham SOF No. 21:</u>  Harris testified that he was hospitalized numerous times during 2016 for infectionsand infection related complications. Harris underwent numerous procedures wherein he was notcompletely sedated due to risk of nerve damage and paralysis. Harris spent 43 nights in

the hospital and had 9 surgeries.  Harris has severe scarring and disfigurement on his chest. (ExhibitA, Judgment, p. 8).

**RESPONSE:**  Admitted that Paragraph 21 accurately quotes an excerpt from the October 9, 2019 Judgment entered by the St. Clair County trial court.  The Insurer-Defendants further state that Harris's expert testified that Harris's infections were bacterial infections.  SUF ¶ 40.

Durham SOF No. 22: The Trial Court adjudged that the St. Clair County Health Department, Center for Disease Control, and Illinois Department of Public Health investigated this particular dialysis center because there was a significant increase in infections between February and August 2016. The final conclusions of that investigation were that defendant Durham Enterprises, Inc. d/b/a CityWide Maintenance of St. Louis was not properly cleaning the facility, in that, it used vinegar as theprimary cleaning agent; it used dirty mop heads to clean the floors; it failed to clean all touchable surfaces; and it failed to disinfect the cleaning cart upon entry and exit from the facility. (Exhibit A, Judgment, p. 3).

**RESPONSE:**  Admitted that Paragraph 22 accurately quotes an excerpt from the October 9, 2019 Judgment entered by the St. Clair County trial court.

Durham SOF No. 23:  On March 18, 2019, Harris filed a motion to sever the claims against Durham Enterprises, Inc. and Don Durham (hereinafter referred to as "Durham") which was granted on April 1, 2019, and the severed claims were given case number 19-L-234. (Exhibit A, Judgment, p. 6).

**RESPONSE:**  Admitted that Paragraph 23 accurately quotes an excerpt from the October 9, 2019 Judgment entered by the St. Clair County trial court.

C.    **Notification Of Harris Claims To Defendant Insurers**

Durham SOF No. 24: The Durham Defendants tendered a request for defense and indemnity to Liberty Mutual and Ohio Security as to the Harris claims.  (Exhibit C, p. 11, ¶ 4).

**RESPONSE:**  Denied.  Exhibit C to Durham's motion for summary judgment is Ohio Security's Answer to Complaint, Affirmative Defenses, Counterclaim and Cross-Claim for Declaratory Judgment.  Paragraph 24 of Exhibit C states that the Durham Defendants tendered a request for defense and indemnity "to Ohio Security Insurance Company."  It does not state that

the request was tendered to Liberty Mutual.  The Insurer-Defendants further state that there is no record evidence that Liberty Mutual ever issued an insurance policy to the Durham Defendants.

### D.      Investigation Of Harris Claims By Liberty Mutual

Durham SOF No. 25: From approximately 2011 to March of 2020 Emily Anderson ("Anderson") was employed through Liberty Mutual as a claims representative. (Exhibit F, deposition of Anderson, p. 8, lines 7 through 22). She was working for Liberty Mutual and she was unsure as to who the underwriter was during her work on the Harris claim. (Exhibit F, deposition of Anderson, p. 21, lines 14 through 19).

RESPONSE:  Admitted that Emily Anderson was employed by Liberty Mutual as a claims representative.  Denied that Emily Anderson was working on behalf of Liberty Mutual while she was evaluating the Durham Defendants' request for a defense and indemnity.  As the Insurer-Defendants' corporate representative stated, he and his colleagues who evaluated the claim were "working on behalf [of] Ohio Security, the underwriting company," while they were evaluating the Durham Defendants' request.  Ex. G at 11:19–25.

The Insurer-Defendants further deny that Anderson did not know who the underwriting company was.  Indeed, when she was shown the denial letter she helped prepare, she testified that Ohio Security was the underwriting Company, and that she would have known that at the time she evaluated the Durham Defendants' request for a defense and indemnity.  Ex. F at 40:22–41:5, 112:17–113:14.

Durham SOF No. 26: Anderson's duties at Liberty Mutual included handling claims. (Exhibit F, deposition of Anderson, p. 9, lines 4 through 7). During the time she was involved with the Harris claim Anderson was a Technical Claims Specialist 1.  (Exhibit F, deposition of Anderson, p. 9, lines 19 through 24).

RESPONSE:  Admitted.

Durham SOF No. 27: The Harris claim was assigned to Anderson on May 9, 2017 by Hilgerman ("Hilgerman") who was Anderson's supervisor at the time.  (Exhibit F, deposition of Anderson, p. 10, lines 8 through 25).

**RESPONSE:** Admitted that Hilgemann[4] assigned the claim to Anderson and that he was her supervisor at the time.

Durham SOF No. 28:  Anderson does not recall whether or not she analyzed in her analysis of the Harrisclaim whether Missouri or Illinois law applied and there was nothing in the Liberty Mutual file that so indicated.  (Exhibit F, deposition of Anderson, p. 17, lines 13 through 24).

**RESPONSE:** Admitted that Anderson testified that she could not recall whether she conducted an analysis of whether Missouri or Illinois law applied, and that she also testified that there was nothing in the claim file on that issue.  The Insurer-Defendants further state that Hilgemann, the Insurer-Defendants corporate representative, and the individual ultimately responsible for sending the denial letter, testified that he understood "Missouri state law" would apply.  Ex. G at 16:12–14.   The Insurer-Defendants further deny that Anderson's lack of recollection creates an issue of material fact on this point. *See, e.g.*, *G&G Closed Cir. Events, LLC v. Castillo*, No. 14-CV-02073, 2017 WL 1079241, at *7 (N.D. Ill. Mar. 22, 2017) ("A witness's inability to recall something will not create a fact issue in the face of affirmative evidence of the fact."); *Rocket v. Marten Transp. Ltd.*, No. 99 C 3957, 2001 WL 1155256, at *6 (N.D. Ill. Sept. 28, 2001) (failure to recall instances of misconduct do not create a genuine issue of material fact that would defeat a motion for summary judgment).

Durham SOF No. 29: Initially, Anderson came to the conclusion that there was no coverage because sheerroneously thought the Harris claim's date of loss was outside the Policy coverage dates. (Exhibit F, deposition of Anderson, p. 27, lines 7 through 24).

**RESPONSE:** Admitted that Anderson testified that, based on the notes from the claim file, she originally thought the date of loss was outside the Ohio Security Policy's effective dates.  Denied that this testimony any relevance to this case, as the denial letter sent by Ohio

---

[4]      "Hilgemann" is the proper spelling of Hilgemann's last name.

Security plainly denied coverage based on the Bacteria Exclusion in the Ohio Security Policy. SUF ¶¶ 20–23.

Durham SOF No. 30: In analyzing whether or not certain exclusions applied, Anderson reviewed the Harris Complaint and the Policy. (Exhibit F, deposition of Anderson, p. 30, lines 6 through 9; p. 31, lines 5 through 7; Exhibit D).

**RESPONSE:** Admitted that Anderson reviewed the FAC and the Ohio Security Policy in evaluating the Durham Defendants' request for a defense and indemnity, but denied that this was all she reviewed. Anderson also testified that she was "applying the policy language to the known facts," which she said were contained in "the emails, the certificate of merit [and] the complaint." Ex. F at 85:3–13; *see also id.* at 134:9–21. She further testified that she had discussions with Don Durham, and also with Hilgemann (*id.* at 35–36), all of which are referenced in the claim file. *See generally* Ex. E at OSIC000003–06.

Durham SOF No. 31: Anderson's manager at the time Hilgerman would make the decision whether or not there was coverage according to Anderson. (Exhibit F, deposition of Anderson, p. 36, lines 3 through 14).

**RESPONSE:** Admitted that Hilgemann was the individual ultimately responsible for making the final determination regarding whether to deny coverage. *See* SUF ¶ 16.

Durham SOF No. 32: The only information reviewed by Anderson was the Policy and the Complaint.(Exhibit F, deposition of Anderson, p. 36, line 15 through p. 37, line 3).

**RESPONSE:** Denied. Anderson testified that she was "applying the policy language to the known facts," which she said were contained in "the emails, the certificate of merit [and] the complaint." Ex. F at 85:3–13; *see also id.* at 134:9–21. She further testified that she had discussions with Don Durham, and also with Hilgemann (*id.* at 35–36), all of which are referenced in the claim file. *See generally* Ex. E at OSIC000003–06.

Durham SOF No. 33: Anderson was not aware of what standard is used in Missouri to analyze if there iscoverage under a policy or not for a given loss. (Exhibit F, deposition of Anderson, p. 37, lines 4through 7).

**RESPONSE:** Admitted that Anderson testified that she did know the legal standard applicable to coverage disputes in Missouri. Denied that this has any relevance, as Hilgemann, the Insurer-Defendants corporate representative, and the individual ultimately responsible for signing off on the coverage analysis, testified that he understood "Missouri state law" would apply, and that he understood Missouri's law with regard to coverage determinations. Ex. G at 16:12–14; *see also id.* at 17–24.

Durham SOF No. 34: In Anderson's analysis she came to the conclusion there was no coverage withoutany knowledge of what the standard is under Missouri law. (Exhibit F, deposition of Anderson, p. 37, lines 8 through 20).

**RESPONSE:** Admitted that Anderson testified that she did know the legal standard applicable to coverage disputes in Missouri. Denied that this has any relevance, as Hilgemann, the Insurer-Defendants corporate representative, and the individual ultimately responsible for signing off on the coverage analysis, testified that he understood "Missouri state law" would apply, and that he understood Missouri's law with regard to coverage determinations. Ex. G at 16:12–14; *see also id.* at 17–24.

Durham SOF No. 35: Anderson, as an employee of Liberty Mutual, did not have an understanding as towhy she was adjusting claims for a policy allegedly written by Ohio Security. (Exhibit F, deposition of Anderson, p. 41, lines 6 through 12).

**RESPONSE:** Admitted that Emily Anderson was employed by Liberty Mutual, but denied that Emily Anderson was working on behalf of Liberty Mutual while she was evaluating the Durham Defendants' request for a defense and indemnity. As the Insurer-Defendants' corporate representative stated, he and his colleagues who evaluated the claim were "working on behalf [of] Ohio Security, the underwriting company," while they were evaluating the Durham Defendants' request. Ex. G at 11:19–25.

The Insurer-Defendants admit that Anderson testified that she did not have an understanding as to why she would adjust claims for policies written by Ohio Security. The

Insurer-Defendants further respond that their corporate representative testified that the reason was because "Liberty Mutual Insurance . . . is the name of an insurance company group.  Liberty Mutual Insurance Company is one member of that group, so there's an arrangement[.] . . . [T]he arrangement is we pool our resources . . . and we handle claims and adjust them on behalf of these underwriting companies, one of . . . which is Ohio Security, who issued the policy in this case." Ex. G at 15:7–22.

Durham SOF No. 36: Anderson was not an employee of Ohio Security. (Exhibit F, deposition ofAnderson, p. 41, lines 19 through 22).

**RESPONSE:**  Admitted that Anderson was not employed by Ohio Security, but denied insofar as Paragraph 36 insinuates that Anderson was evaluating the Durham Defendants' request for a defense and indemnity on behalf of Liberty Mutual.  As the Insurer-Defendants' corporate representative stated, he and his colleagues who evaluated the claim were "working on behalf [of] Ohio Security, the underwriting company," while they were evaluating the Durham Defendants' request.  Ex. G at 11:19–25.

Durham SOF No. 37: Anderson was not an employee of Ohio Casualty. (Exhibit F, deposition ofAnderson, p. 41, lines 23 through 25).

**RESPONSE:**  Admitted that Anderson was not employed by Ohio Casualty, but denied insofar as Paragraph 37 insinuates that Anderson was evaluating the Durham Defendants' request for a defense and indemnity on behalf of Liberty Mutual.  As the Insurer-Defendants' corporate representative stated, he and his colleagues who evaluated the claim were "working on behalf [of] Ohio Security, the underwriting company," while they were evaluating the Durham Defendants' request.  Ex. G at 11:19–25.

Durham SOF No. 38: Anderson had no idea why the denial letter was on the letterhead of LibertyMutual instead of Ohio Security other than she worked for Liberty Mutual. (Exhibit F, deposition of Anderson, p. 42, lines 1 through 4).

**RESPONSE:** Denied.  The question asked of Anderson incorrectly assumed that Liberty Mutual Insurance Company is the same as the Liberty Mutual Insurance group of underwriting companies.  The denial letter was written on the letterhead of Liberty Mutual Insurance group, not Liberty Mutual Insurance Company.  Ex. E at OSIC000113–117 (referencing "Liberty Mutual Insurance"—the group—not "Liberty Mutual Insurance Company").  This difference was explained by the Insurer-Defendants' corporate representative, who testified that "Liberty Mutual Insurance . . . is the name of an insurance company group.  Liberty Mutual Insurance Company is one member of that group, so there's an arrangement[.] . . . [T]he arrangement is we pool our resources . . . and we handle claims and adjust them on behalf of these underwriting companies, one of . . . which is Ohio Security, who issued the policy in this case."  Ex. G at 15:7–22.

Durham SOF No. 39:  Ohio Security did not oversee her work to her knowledge. (Exhibit F, depositionof Anderson, p. 42, lines 5 through 6).

**RESPONSE:**  Admitted that Anderson testified that, to her knowledge, no one from Ohio Security oversaw her work.  Denied that his has any relevance, as the Insurer-Defendants' corporate representative testified that he and his colleagues who evaluated the claim were "working on behalf [of] Ohio Security, the underwriting company," while they were evaluating the Durham Defendants' request.  Ex. G at 11:19–25.

Durham SOF No. 40:  The only two Liberty Mutual employees that she was aware that worked on theHarris claim was herself and Hilgerman. (Exhibit F, deposition of Anderson, p. 42, lines 10 through 15).

**RESPONSE:**  Admitted that Anderson testified that, to her knowledge, the only two employees who worked on the Durham Defendants' request for a defense and indemnity were herself and Hilgemann.  Denied insofar as Paragraph 40 insinuates that Anderson and Hilgemann were evaluating the Durham Defendants' request for a defense and indemnity on behalf of Liberty Mutual.  As the Insurer-Defendants' corporate representative stated, he and his colleagues who

evaluated the claim were "working on behalf [of] Ohio Security, the underwriting company," while they were evaluating the Durham Defendants' request.  Ex. G at 11:19–25.

Durham SOF No. 41: Anderson did no investigation in terms of looking at Harris's medical records ortaking a look at what the litigation in the Harris case provided in terms of depositions. (ExhibitF, deposition of Anderson, p. 47, lines 11 through 16).

**RESPONSE:** Admitted that Anderson did not review medical records or depositions during her evaluation of the Durham Defendants' request for a defense and indemnity, but denied that Paragraph 41 cites evidence that medical records or depositions: (1) were available at the time of Anderson's evaluation; and (2) were ever offered to Anderson by either Harris or the Durham Defendants.

Durham SOF No. 42:  Anderson did not know the specific bacteria that was involved in the Harris claim.(Exhibit F, deposition of Anderson, p. 50, line 24 through p. 51, line 7).

**RESPONSE:**  Admitted that Anderson testified that she did not know the specific type of bacteria that led to Harris's bacterial infections, but denied that the type of bacteria is relevant to the coverage determination in this case.  The Certificate of Merit, which was attached to, and filed with the FAC—as required by 735 Ill. Comp. Stat. Ann. 5/2-622—asserted that Harris was "at [a] significantly increased risk of bacterial sepsis" and that Harris was ultimately "diagnosed with both gram positive and gram negative sepsis."  SUF ¶ 8.

Durham SOF No. 43:  Anderson was unaware of how many different kinds of fungi there are and did notattempt to find out.  (Exhibit F, deposition of Anderson, p. 51, lines 8 through 12).

**RESPONSE:**  Admitted.  The Insurer-Defendants further deny that Paragraph 43 has any relevance to this dispute, as Ohio Security denied the Durham Defendants' request for a defense and indemnity based on the fact that Harris suffered from bacterial—not fungal—infections, as set forth in the Certificate of Merit.  SUF ¶¶ 8, 20–23.

Durham SOF No. 44:  Anderson testified that there was nothing in the certificate of merit that she recalled that led her to the conclusion that coverage should be denied. (Exhibit F, deposition ofAnderson, p. 53, lines 9 through 13; Exhibit E, p. 107 OSIC 107).

**RESPONSE:** Denied.   Though Anderson initially testified that she could not "recall"—four years after evaluating the Durham Defendants' request for a defense and indemnity—whether the Certificate of Merit led to her conclusion that coverage should be denied, she later testified that she did rely on the Certificate of Merit's assertion that Harris contracted bacterial sepsis.  Ex. F at 85:3–86:15; *see also id.* at 134:9–21.

Durham SOF No. 45: Anderson thought that the word "fungus" was not defined by the policy.(Exhibit F, deposition of Anderson, p. 64, line 6 through p. 65, line 1).

**RESPONSE:** Denied.   In the testimony cited in Paragraph 45, Anderson specifically reads the definition of "fungi" from the Ohio Security Policy.  The Insurer-Defendants further deny that Paragraph 45 has any relevance to this dispute, as Ohio Security denied the Durham Defendants' request for a defense and indemnity based on the fact that Harris suffered from bacterial—not fungal—infections, as set forth in the Certificate of Merit.  SUF ¶¶ 8, 20–23.

Durham SOF No. 46:  There was no indication in the Liberty Mutual file that Anderson had consulted any medical authorities or treatises to find out the definition of the word fungus. (Exhibit F, deposition of Anderson, p. 65, lines 11 through 15).

**RESPONSE:**  Admitted that Anderson testified that, based on her cursory review of the claim file during the deposition, there was no indication that she consulted medical authorities or treatises to determine the definition of fungus.  Nor did she need to, as "fungi"—the plural form of "fungus"—was defined in the Bacteria Exclusion.  The Insurer-Defendants deny that Paragraph 46 has any relevance to this dispute, as Ohio Security denied the Durham Defendants' request for a defense and indemnity based on the fact that Harris suffered from bacterial—not fungal—infections, as set forth in the Certificate of Merit.  SUF ¶¶ 8, 20–23. Finally, the Insurer-Defendants deny that the claim file in this case was Liberty Mutual's.  Indeed, the claim file refers to Ohio Security as the underwriting company, and it was produced in this case by Ohio Security, as indicated by the bates prefix "OSIC" at the bottom of each page.  *See generally* Ex. E.

Durham SOF No. 47: Anderson did not know if any type or form of fungus was involved in the Harrisclaim.  (Exhibit F, deposition of Anderson, p. 65, line 24 through p. 66, line 2).

**RESPONSE:**  Admitted.  The Insurer-Defendants deny that Paragraph 47 has any relevance to this dispute, as Ohio Security denied the Durham Defendants' request for a defense and indemnity based on the fact that Harris suffered from bacterial—not fungal—infections, as set forth in the Certificate of Merit.  SUF ¶¶ 8, 20–23.

Durham SOF No. 48: Anderson did not know if "mold or mildew, and any mycotoxins, spores, scents,or by-products produced or released by fungi" was involved in the Harris claim. (Exhibit F, deposition of Anderson, p. 66, lines 3 through 15).

**RESPONSE:**  Admitted.  The Insurer-Defendants deny that Paragraph 48 has any relevance to this dispute, as Ohio Security denied the Durham Defendants' request for a defense and indemnity based on the fact that Harris suffered from bacterial—not fungal—infections, as set forth in the Certificate of Merit.  SUF ¶¶ 8, 20–23.

Durham SOF No. 49: Anderson testified that it would possibly be important in her determination to understand the definition of fungi or bacteria. (Exhibit F, deposition of Anderson, p. 67, lines 17through 20).

**RESPONSE:**  Admitted.  The Insurer-Defendants further respond that Anderson testified that, based on her understanding at the time of the deposition, bacteria meant "microorganisms that may cause disease."  Ex. F at 66:24–67:1.

Durham SOF No. 50: Anderson agreed that if there was fungi or bacteria that are on, or contained in, the good or product intended for bodily consumption, the fungi and bacteria exclusion does notapply.  (Exhibit F, deposition of Anderson, p. 68, lines 8 through 17).

**RESPONSE:**  Admitted that Anderson testified that the exception could have applied if there was information demonstrating that Harris's bacterial infections arose from "'fungi' or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption," but denied that Anderson testified that she was ever provided such information in either the FAC, the Certificate of Merit, or any conversations with the Durham Defendants.  *See generally*  Ex. F).   The Insurer-Defendants further respond that Hilgemann, the Insurer-

Defendants' corporate representative and the individual who ultimately decided whether to deny coverage, testified:

> So as I said, I based it on the Count 3 [of the FAC] information provided and the Certificate of Merit, in combination, which stated it was failure to properly sanitize the dialysis facility.  I did not believe that it involved a good or a product based on the information presented.

SUF ¶¶ 18–19.

> <u>Durham SOF No. 51:</u> Anderson admitted that if the bacteria or fungi had been on a good or productintended for bodily consumption the exclusion potentially could not apply and that she couldonly go on the basis of the allegations in the Complaint as to that determination. (Exhibit F, deposition of Anderson, p. 68, line 18 through p. 69).

**RESPONSE:** Admitted that Anderson testified that the exception could have applied if there was information demonstrating that Harris's bacterial infections arose from "'fungi' or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption," but denied that Anderson testified that she was ever provided such information in either the FAC, the Certificate of Merit, or any conversations with the Durham Defendants.  *See generally* Ex. F.  Indeed, the Insurer-Defendants' corporate representative and the individual who ultimately decided whether to deny coverage, testified:

> So as I said, I based it on the Count 3 [of the FAC] information provided and the Certificate of Merit, in combination, which stated it was failure to properly sanitize the dialysis facility.  I did not believe that it involved a good or a product based on the information presented.

SUF ¶¶ 18–19.  The Insurer-Defendants further deny that Anderson's coverage analysis was limited to the FAC, as she testified that she "appl[ied] the policy language to the known facts," which she said were contained in "the emails, the certificate of merit [and] the complaint."  Ex. F at 85:3–13; *see also id.* at 134:9–21.  She further testified that she had discussions with Don Durham, and also with Hilgemann (*id.* at 35–36), all of which are referenced in the claim file.  *See generally* Ex. E at OSIC000003–06.

Durham SOF No. 52: Anderson did not obtain a copy of the Court file because she had denied coveragebased on the information provided to Liberty Mutual. (Exhibit F, deposition of Anderson, p. 72,lines 14 through 19).

**RESPONSE:** Admitted that Anderson testified that she did not obtain a copy of the court file "because we had denied coverage based on the information provided to us."  Denied to the extent Paragraph 52 insinuates that the coverage analysis was performed on behalf of Liberty Mutual.  As the Insurer-Defendants' corporate representative stated, he and his colleagues who evaluated the claim were "working on behalf [of] Ohio Security, the underwriting company," while they were evaluating the Durham Defendants' request.  Ex. G at 11:19–25.

Durham SOF No. 53: Anderson admitted that potentially the Harris claim could represent millions ofdollars in damages.  (Exhibit F, deposition of Anderson, p. 75, lines 2 through 6).

**RESPONSE:** Denied.  The question asked of Anderson in the exhibit cited in Paragraph 53 was:  "So potentially it could be a few bucks, or it could be millions of dollars, correct?"  Anderson then testified, "Yeah."

Durham SOF No. 54: Anderson admitted that infections can be caused by things other than fungi andbacteria. (Exhibit F, deposition of Anderson, p. 82, line 24 through p. 83, line 1).

**RESPONSE:** Admitted that Anderson answered "potentially" in response to the question articulated in Paragraph 54, but denied that Anderson testified that she had any information—either from the FAC, the Certificate of Merit, or the information provided by the Durham Defendants—that Harris's infections were anything other than bacterial infections.  *See generally* Ex. F.

Durham SOF No. 55: Anderson stated that whether an infection could be caused by improper cleaningdue to something other than fungi or bacteria would require further review. (Exhibit F, deposition of Anderson, p. 84, lines 1 through 13).

**RESPONSE:** Admitted that Anderson testified that whether a non-bacterial and non-fungal infection was covered under the Ohio Security Policy would require further review, but denied that Anderson testified that she had any information—either from the FAC, the

Certificate of Merit, or the information provided by the Durham Defendants—that Harris's infections were anything other than bacterial infections. *See generally* Ex. F.

Durham SOF No. 56: Anderson admitted that if Harris's infection was caused by something other than fungus or bacteria then the fungus or bacterial exclusion would not apply. (Exhibit F, deposition of Anderson, p. 91, lines 9 through 14).

**RESPONSE:** Admitted that Anderson testified that, if Harris's infections were non-fungal and non-bacterial in nature, then the exception would not apply, but denied that Anderson testified that she had any information—either from the FAC, the Certificate of Merit, or the information provided by the Durham Defendants—that Harris's infections were anything other than bacterial infections. *See generally* Ex. F.

Durham SOF No. 57: The sole basis of Anderson determining that Harris's infection was caused by a bacteria was Exhibit D, Page 107 that was authored by an unknown person who purported to be a medical doctor.  (Exhibit F, deposition of Anderson, p. 91, lines 15 through 20).

**RESPONSE:** Admitted that Anderson relied on the Certificate of Merit's assertion that Harris suffered from bacterial infections as part of her determination that Harris's claims were not covered under the Ohio Security Policy.

Durham SOF No. 58: There was nothing in the Liberty Mutual claims file other than page 107 of Exhibit D that states whether Harris's infection was caused by a fungus or bacteria.  (Exhibit F, deposition of Anderson, p. 92, lines 8 through 13).

**RESPONSE:** Admitted that the only reference in the claim file to Harris's bacterial infection is found in the Certificate of Merit, which was filed with, and attached to, the FAC.  Denied that the claim file in this case was Liberty Mutual's.  Indeed, the claim file refers to Ohio Security as the underwriting company, and it was produced in this case by Ohio Security, as indicated by the bates prefix "OSIC" at the bottom of each page. *See generally* Ex. E.

Durham SOF No. 59: Anderson testified that in a situation in which she doesn't have enough information to deny coverage based on the Complaint they attempt to obtain more information.(Exhibit F, deposition of Anderson, p. 94, lines 5 through 18).

**RESPONSE:** Admitted that Anderson testified that "It would require more information, yes" in response to the hypothetical question, "absent [the Certificate of Merit], you couldn't make a determination one way or the other, correct?" Of course, Anderson had the Certificate of Merit, which plainly stated that Harris suffered from bacterial infections. SUF ¶ 8; Ex. F at 85:3–13; *see also id.* at 134:9–21.

Durham SOF No. 60: In those situations where there is not enough information to deny coverage Liberty Mutual could defend the case under reservation of right and conduct discovery. (ExhibitF, deposition of Anderson, p. 94, lines 19 through 23).

**RESPONSE:** Admitted that, in certain cases completely unrelated to this case, an insurer could choose to defend under a reservation of rights and conduct discovery, but denied that Anderson testified that she believed Ohio Security should have defended under a reservation of rights and conduct discovery in this case. *See generally* Ex. F.

Durham SOF No. 61: Anderson admitted that the Harris Complaint dictated coverage regardless of whatactually occurred. (Exhibit F, deposition of Anderson, p. 99, lines 21 through 24).

**RESPONSE:** Denied. Anderson testified that she "appl[ied] the policy language to the known facts," which she said were contained in "the emails, the certificate of merit [and] the complaint." Ex. F at 85:3–13; *see also id.* at 134:9–21. She further testified that she had discussions with Don Durham, and also with Hilgemann (*id.* at 35–36), all of which are referenced in the claim file. *See generally* Ex. E at OSIC000003–06.

Durham SOF No. 62: Liberty Mutual provided her with resources where if Anderson had medical questions she could go to those resources to obtain additional information. (Exhibit F, depositionof Anderson, p. 127, lines 18 through 22).

**RESPONSE:** Admitted that Anderson testified "yes" in response to the question, "So if you aren't a medical expert, did Liberty Mutual provide you with resources where you had medical questions, you could go to those resources to get additional information?" The Insurer-Defendants further note that Anderson testified that she "possibly" took advantage of those

resources in this case.  Ex. F at 127:23–25.  Finally, the Insurer-Defendants note that "resources" would not have included access to doctors, as Hilgemann testified.  Ex. G at 76–77.

Durham SOF No. 63:  Liberty Mutual provided Anderson with the resources to consult with a legal authority if she has questions but there is no indication from her file that she did that. (Exhibit F,deposition of Anderson, p. 128, lines 9 through 15).

**RESPONSE:**  Admitted that Anderson testified that she was provided "the ability to consult with a legal authority if [she] ha[d] questions," but denied that Anderson testified that she believed such a consultation was necessary in this case.  *See generally* Ex. F.

Durham SOF No. 64:  Anderson had the ability to recommend that the Durhams would be provided adefense subject to a reservation of rights. (Exhibit F, deposition of Anderson, p. 130, lines 6 through 11).

**RESPONSE:**  Admitted that Anderson had the ability to recommend defending pursuant to a reservation of rights, but denied that she testified that she believed that this was the proper course of action in this case.  *See generally* Ex. F.  The Insurer-Defendants further deny that Anderson had ultimate responsibility for that decision, as the person ultimately in charge of the coverage determination was Hilgemann.  SUF ¶ 16.

Durham SOF No. 65:  Anderson had the option to recommend that a declaratory action be undertaken todetermine coverage.  (Exhibit F, deposition of Anderson, p. 131, lines 4 through 7).

**RESPONSE:**  Admitted that Anderson had the ability to recommend filing a declaratory action, but denied that she testified that she believed that this was the proper course of action in this case.  *See generally* Ex. F.  The Insurer-Defendants further deny that Anderson had ultimate responsibility for that decision, as the person ultimately in charge of the coverage determination was Hilgemann.  SUF ¶ 16.

Durham SOF No. 66:  Andersons read Exhibit D, Page 107 to mean that "there may be a correlation withthe failing to properly sanitize the dialysis facility." (Exhibit F, deposition of Anderson, p. 132, lines 5 through 7).

**RESPONSE:**  Denied.  The question asked was: "[the Certificate of Merit] doesn't talk about what caused any of these problems with Mr. Harris, right?"  Anderson responded:  "It

is the opinion of the person drafting it, that there may have been a correlation with failing to

properly sanitize the dialysis facility."   Anderson also testified that she "appl[ied] the policy

language to the known facts," which she said were contained in "the emails, the certificate of merit

[and] the complaint."  Ex. F at 85:3–13; *see also id.* at 134:9–21.  The FAC plainly alleges that

Durham "negligently and carelessly failed to properly clean and sanitize said dialysis center."  SUF

¶ 4.  In addition, Hilgemann testified in response to a similar line of questioning that the FAC and

the Certificate of Merit make clear that the cause of Harris's bacterial infections—insofar as the

allegations related to Durham—was Durham's alleged failure to properly clean and sanitize the

dialysis center.  Ex. G at 68:2–71:3.

Durham SOF No. 67:  Hilgerman was called as a 30(b)(6) for Defendant's Liberty Mutual
Insurance Company, Ohio Security Insurance Company and Ohio Casualty Insurance Company.
(ExhibitG, deposition of Hilgerman, p. 5, lines 8 through 13).

RESPONSE:  Admitted that Hilgemann was the corporate representative for the

Insurer-Defendants.

Durham SOF No. 68:  At all times relevant herein Hilgerman was employed by Liberty
Mutual.(Exhibit G, deposition of Hilgerman, p. 6, lines 17 through 23).

RESPONSE:  Admitted.

Durham SOF No. 69:  Hilgerman was a Claims Team Manager.  (Exhibit G, deposition of
Hilgerman p. 6, line 24 through p. 7, line 1).

RESPONSE:  Admitted.

Durham SOF No. 70:  Other than the denial letter Hilgerman has no recollection about the
Harris claim.(Exhibit G, deposition of Hilgerman p. 10, lines 9 through 12).

RESPONSE:  Denied.   Hilgemann testified "I don't recall" in response to the

question, "other than reviewing the denial letter that Emily Anderson drafted, dated May 15, 2017,

do you recall doing anything else about this claim?"  Hilgemann later testified about his analysis

of the claim beyond what was set forth in the denial letter.  For example, Hilgemann testified that

the conclusion that there was no possibility of coverage was "straightforward . . . based on the

information provided," which included the FAC, affidavit and Certificate of Merit.   SUF ¶ 17.

With regard to the exception, Hilgemann testified:

> So as I said, I based it on the Count 3 [of the FAC] information provided and the
> Certificate of Merit, in combination, which stated it was failure to properly sanitize
> the dialysis facility.  I did not believe that it involved a good or a product based on
> the information presented.

SUF ¶ 19.  He also testified that he and Anderson had discussions about the matter before sending

the denial letter, (Ex. G at 10:15–20), as referenced in the claim file, (*see generally* Ex. E at

OSIC000003–06), and Anderson's deposition.  SUF ¶ 12.

Durham SOF No. 71:  If Hilgerman had done anything else as to the Harris claim it would
likely be documented in the claims file.  (Exhibit G, deposition of Hilgerman, p. 10, lines 13
through 20).

> **RESPONSE:**  Denied.  Hilgemann testified about his analysis of the claim beyond

what was set forth in the claim file.  For example, Hilgemann testified that the conclusion that

there was no possibility of coverage was "straightforward . . . based on the information provided,"

which included the FAC, affidavit and Certificate of Merit.  SUF ¶ 17.  With regard to the

exception, Hilgemann testified:

> So as I said, I based it on the Count 3 [of the FAC] information provided and the
> Certificate of Merit, in combination, which stated it was failure to properly sanitize
> the dialysis facility.  I did not believe that it involved a good or a product based on
> the information presented.

SUF ¶ 19.  He also testified that he and Anderson had discussions about the matter before sending

the denial letter, (Ex. G at 10:15–20), as referenced in the claim file, (*see generally* Ex. E at

OSIC000003–06), and Anderson's deposition.  SUF ¶ 12.

Durham SOF No. 72:  The only notation of any work he performed on the Harris claim was
for reviewing and approving the denial letter and there was no notation as to any discussion
betweenhe and Anderson.  (Exhibit G, deposition of Hilgerman p. 10, lines 13 through 24).

> **RESPONSE:**  Denied.  Hilgemann testified about his analysis of the claim beyond

what was set forth in the claim file.  For example, Hilgemann testified that the conclusion that

there was no possibility of coverage was "straightforward . . . based on the information provided," which included the FAC, affidavit and Certificate of Merit.  SUF ¶ 17.  With regard to the exception, Hilgemann testified:

> So as I said, I based it on the Count 3 [of the FAC] information provided and the Certificate of Merit, in combination, which stated it was failure to properly sanitize the dialysis facility.  I did not believe that it involved a good or a product based on the information presented.

SUF ¶ 19.  He also testified that he and Anderson had discussions about the matter before sending the denial letter, (Ex. G at 10:15–20), as referenced in the claim file, (*see generally* Ex. E at OSIC000003–06), and Anderson's deposition.  SUF ¶ 12.

    Durham SOF No. 73:  Hilgerman stated it was fair that the only work that he did on the Harris claim was limited to reviewing the denial letter.  (Exhibit G, Deposition of Joshua Hilgerman, p. 10, lines 25 through p. 11, line 7).

        **RESPONSE:**  Admitted that Hilgemann testified that the question asked of him in the passage cited in Paragraph 73 was fair, but denied that this was the only work he did in his coverage analysis.  For example, Hilgemann testified that the conclusion that there was no possibility of coverage was "straightforward . . . based on the information provided," which included the FAC, affidavit and Certificate of Merit.  SUF ¶ 17.  With regard to the exception, Hilgemann testified:

> So as I said, I based it on the Count 3 [of the FAC] information provided and the Certificate of Merit, in combination, which stated it was failure to properly sanitize the dialysis facility.  I did not believe that it involved a good or a product based on the information presented.

SUF ¶ 19.  He also testified that he and Anderson had discussions about the matter before sending the denial letter, (Ex. G at 10:15–20), as referenced in the claim file, (*see generally* Ex. E at OSIC000003–06), and Anderson's deposition.  SUF ¶ 12.

    Durham SOF No. 74:  Hilgerman testified that if there is a possibility of coverage he would not havesent the denial letter.  (Exhibit G, deposition of Hilgerman, p. 23, lines 1 through 2).

        **RESPONSE:**  Admitted.

Durham SOF No. 75: There was no discussion between Hilgerman and Anderson as to filing a declaratory judgment action to determine f there was coverage. (Exhibit G, deposition of Hilgerman, p. 23, lines 22 through 25).

**RESPONSE:** Denied.  In the testimony cited in Paragraph 75, Hilgemann testified

that he did not recall whether he and Anderson had any such a conversation.

Durham SOF No. 76: Hilgerman did not consult with an attorney as to whether or not to file a declaratory judgment action to determine coverage.  (Exhibit G, deposition of Hilgerman, p. 24, lines 11 through 16).

**RESPONSE:** Admitted.

Durham SOF No. 77: Hilgerman admitted that there was nothing in the claim file that suggested there was any medical research as to terms in the Harris Complaint. (Exhibit G, deposition of Hilgerman, p. 25, lines 16 through 20).

**RESPONSE:** Admitted that Hilgemann testified there was no indication in the

claim file of medical research being performed.  Hilgemann also testified that he could not recall

whether he performed any such research, and that, if he did, it would not appear in the claim file.

Ex. G at 24:22–25:20.

Durham SOF No. 78: The denial letter was strictly based on the exclusion in the policy and not having to do with whether or not the incident occurred within the policy period. (Exhibit G, deposition of Hilgerman, p. 27, lines 1 through 5).

**RESPONSE:** Admitted.

Durham SOF No. 79: Hilgerman testified that there wasn't any information in the documents that suggested fungi was involved.  (Exhibit G, deposition of Hilgerman, p. 30, lines 7 through 11).

**RESPONSE:** Admitted.

Durham SOF No. 80: Hilgerman admitted there was nothing in the Complaint that talks about bacteria.(Exhibit G, deposition of Hilgerman, p. 31, lines 14 through 19).

**RESPONSE:** Admitted that Hilgemann testified that there was nothing in the FAC

itself that mentioned bacteria.  Hilgemann also testified that the Certificate of Merit—which was

attached to, and filed with, the FAC—did state that Harris suffered from bacterial infections, and

that he relied on the Certificate of Merit as part of his coverage analysis.  SUF ¶¶ 12, 16–19.

26

Durham SOF No. 81: Hilgerman admitted that the only mention of bacteria was the statement on Exhibit D, Page 107 that stated that "by failing to properly sanitize the dialysis facility, Mr.Harris was at significantly increased risk of bacteria sepsis." (Exhibit G, deposition of Hilgerman, p. 31, lines 22 through p. 32, line 1).

RESPONSE: Admitted.

Durham SOF No. 82: Hilgerman admitted that there was nothing in his file that indicated there was anyresearch into the meaning of bacterial sepsis. (Exhibit G, deposition of Hilgerman, p. 32, lines 20 through 24).

RESPONSE: Admitted that Hilgemann testified that there was nothing in the claim file indicating that he did research into the meaning of bacterial sepsis. Hilgemann also testified that, while he did not have a specific recollection of performing this research, he "would imagine" that he would have done so at the time of his coverage analysis, and he thinks (though could not recall) that Anderson would have also done that "and discussed it with [Hilgemann]." Ex. G at 32:8–17.

Durham SOF No. 83: Hilgerman did not have a good answer for his general understanding of the term"bacterial sepsis". (Exhibit G, deposition of Hilgerman, p. 33, lines 17 through 25).

RESPONSE: Admitted that Hilgemann testified that—four years after the claim at issue was denied—he did not have a good definition for the term "bacterial sepsis," and he did not want to "mischaracterize" it. Ex. G at 33). Hilgemann also testified that, while he did not have a specific recollection of performing this research into the meaning of this term—again, four years after the fact—he "would imagine" that he would have done so at the time of his coverage analysis, and he thinks (though could not recall) that Anderson would have done the same "and discussed it with [Hilgemann]." Ex. G at 32:8–17.

Durham SOF No. 84: Hilgerman could not say whether or not the dialysis center could have had a goodor product intended for bodily consumption. (Exhibit G, deposition of Hilgerman, p. 37, lines 11through 17).

RESPONSE: Denied. Hilgemann testified that, "based on the information provided," there was no indication that Harris's bacterial infections came from a good or product

intended for bodily consumption.  Ex. G at 37:18–33:1; *see also id.* at 36:23–37:5.  He also testified:

> So as I said, I based it on the Count 3 [of the FAC] information provided and the Certificate of Merit, in combination, which stated it was failure to properly sanitize the dialysis facility.  I did not believe that it involved a good or a product based on the information presented.

SUF ¶ 19.

Durham SOF No. 85:  Hilgerman did not know if there was a good or product intended for bodily consumption in the dialysis facility. (Exhibit G, deposition of Hilgerman, p. 39, lines 11 through18).

RESPONSE: Denied.   Hilgemann testified that, "based on the information provided," there was no indication that Harris's bacterial infections came from a good or product intended for bodily consumption.  Ex. G at 37:18–33:1; *see also id.* at 36:23–37:5.  He also testified:

> So as I said, I based it on the Count 3 [of the FAC] information provided and the Certificate of Merit, in combination, which stated it was failure to properly sanitize the dialysis facility.  I did not believe that it involved a good or a product based on the information presented.

SUF ¶ 19.

Durham SOF No. 86:  There was nothing in the Certificate of Merit (Exhibit D, p. 107) that indicated that it did not involve a good or product intended for bodily consumption. (Exhibit D, depositionof Hilgerman, p. 81, lines 20 through 25).

RESPONSE: Denied.   Hilgemann testified that, "based on the information provided," there was no indication that Harris's bacterial infections came from a good or product intended for bodily consumption.  Ex. G at 37:18–33:1; *see also id.* at 36:23–37:5.  He also testified:

> So as I said, I based it on the Count 3 [of the FAC] information provided and the Certificate of Merit, in combination, which stated it was failure to properly sanitize the dialysis facility.  I did not believe that it involved a good or a product based on the information presented.

SUF ¶ 19.

**Durham SOF No. 87:**  Hilgerman testified that he was not sure if the improper sanitation of a dialysis facility could involve the improper sanitation of goods or products that are intended for bodilyconsumption.  (Exhibit G, deposition of Hilgerman, p. 84, lines 15 through 20).

**RESPONSE:**  Denied.   Hilgemann   testified   that,   "based   on   the   information provided," there was no indication that Harris's bacterial infections came from a good or product intended for bodily consumption.   Ex. G at 37:18–33:1; *see also id.* at 36:23–37:5.   He also testified:

> So as I said, I based it on the Count 3 [of the FAC] information provided and the Certificate of Merit, in combination, which stated it was failure to properly sanitize the dialysis facility.  I did not believe that it involved a good or a product based on the information presented.

SUF ¶ 19.

### E.   Denial of Durham Defendants' Request For A Defense Of The Harris Claims By Liberty Mutual

**Durham SOF No. 88:**  The Policy contained the following exclusion:

**RESPONSE:**  Admitted.

### FUNGI OR BACTERIA EXCLUSION

89.   Fungi or Bacterial Exclusion this endorsement modifies the insurance provide under the following:

A.   The following exclusion is added to Paragraph **2.**Exclusions of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

**2., Exclusions**

This insurance does not apply to:

**Fungi or Bacteria**

**a.**   "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, allegedor threatened inhalation of, ingestion of, contact with, exposure to, existenceof, or presence of, any "fungi" or bacteria on or within a building or structure,including its contents, regardless of whether any other cause, event, materialor product contributed concurrently or in any sequence to such injury or damage.

  **b.**  Any loss, cost or expenses arising out ofthe abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediatingor disposing of, or in any way Responding to, or assessing the effectsof, "fungi" or bacteria, by any insuredor by any other person or entity. This exclusion does not apply to any "fungi"or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption. (Exhibit B, p. OSIC000195).

  Fungi is defined as:

**C.**  The following definition is added to the Definitions Section: "Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or by-products produced or released by fungi.

  **RESPONSE:** Admitted.

  <u>Durham SOF No. 90:</u>  On May 15, 2017, Liberty Mutual sent a letter to Don Durham denying coverageand refusing to defendant Durham Enterprises, Inc. d/b/a City Wide Maintenance of St. Louisbecause the Policy excluded any loss due to the Fungi or Bacterial Exclusion. (Exhibit E, Liberty Mutual Denial Letter; Exhibit D, Ohio Security Answer, p. 7).

  **RESPONSE:** Denied that the letter was sent on behalf of Liberty Mutual.  The

letter was sent on behalf of Ohio Security, as indicated by the letter, which identifies Ohio Security

as the underwriting company, and specifically states that "Ohio Security . . . denies coverage for

this Lawsuit and will not participate in the defense of City Wide or pay any settlements or

judgments on its behalf."  SUF ¶¶ 20–21.

  <u>Durham SOF No. 91:</u>  The decision as to whether or an exclusion in the Policy applied was notdetermined by Anderson but rather by her manager according to Anderson. (Exhibit F, deposition of Anderson, p. 31, lines 8 through 16).

  **RESPONSE:** Admitted.

  <u>Durham SOF No. 92:</u>  Anderson had determined that the "fungi or bacteria exclusion" could apply.(Exhibit F, deposition of Anderson, p. 32, lines 13 through 16).

  **RESPONSE:** Denied.  Anderson testified that the exclusion "does apply based on

the known facts."  Ex. F at 32:16–17.

Durham SOF No. 93:     The denial of coverage letter Anderson wrote to Don Durham was drafted sometime between May 9 and May 15 of 2017.  (Exhibit F, deposition of Anderson, p. 38, lines13 through 19).

**RESPONSE:** Admitted.

Durham SOF No. 94:     Anderson estimated that she spent between two and four hours to make an analysis that there was no coverage under the Policy.  (Exhibit D, deposition of Anderson, p. 48,lines 5 through 6).

**RESPONSE:** Admitted.  The Insurer-Defendants also note that Anderson testified that she was "guess[ing]," that she was "not sure how to answer that," and that she did not know how much time Hilgemann spent during his review.   Ex. F at 47:21–48:19.   The Insurer-Defendants further note that counsel for the Durham Defendants never specified what he meant by "analysis."  *Id.*

Durham SOF No. 95:     The Harris Complaint did not use the words "bacteria or fungi" but rather used the word infections and alleged improper cleaning. (Exhibit F, deposition of Anderson, p. 44, lines 12 through 15; p. 45, lines 12 through 13).

**RESPONSE:** Admitted that the FAC did not mention the words "bacteria" or "fungi."  The Insurer-Defendants further respond that the Certificate of Merit—which was attached to, and filed with, the FAC—did state that Harris suffered from bacterial infections, and that he relied on the Certificate of Merit as part of his coverage analysis.  SUF ¶¶ 12, 16–19.  The Insurer-Defendants further deny that the FAC alleged "improper cleaning," as the FAC alleged that Durham: (1) "was providing commercial cleaning services to the dialysis center located at 5105 W Main St., Belleville, IL 62226-4728"; and (2) that Durham Enterprises "negligently and carelessly failed to properly clean and sanitize said dialysis center."  SUF ¶ 4.

Durham SOF No. 96:     The statement in the Complaint that an infection was involved does not equate ormean the same thing as "bacteria or fungi". (Exhibit F, deposition of Anderson, p. 46, lines 10 through 14).

31

**RESPONSE:** Admitted that the word infection, by itself, does not indicate that the infection was bacterial. The Insurer-Defendants further note that the Certificate of Merit plainly stated that Harris's infections were bacterial. SUF ¶ 8.

Durham SOF No. 97:    The Complaint use of the words "improper cleaning" do not mean the same thingas "bacteria or fungi". (Exhibit F, deposition of Anderson, p. 46, lines 19 through p. 47, line 6).

**RESPONSE:** Denied. The FAC does not allege "improper cleaning." The FAC alleged that Durham: (1) "was providing commercial cleaning services to the dialysis center located at 5105 W Main St., Belleville, IL 62226-4728"; and (2) that Durham Enterprises "negligently and carelessly failed to properly clean and sanitize said dialysis center." SUF ¶ 4. Further, the Certificate of Merit stated, in part, that Harris was "at [a] significantly increased risk of bacterial sepsis" and that Harris was ultimately "diagnosed with both gram positive and gram negative sepsis." SUF ¶ 8.

Durham SOF No. 98:    Anderson did not consult any medical experts as to the meaning of infectionversus bacteria or fungi. (Exhibit F, deposition of Anderson, p. 50, lines 13 through 20).

**RESPONSE:** Admitted. The Insurer-Defendants further note that there was no indication that Harris's injuries were anything but bacterial, as set forth in the Certificate of Merit. SUF ¶ 8.

Durham SOF No. 99:    Anderson admitted that even if she came to the conclusion there was no coveragethat does not mean there is not a duty to defend. (Exhibit F, deposition of Anderson, p. 60, lines18 through 21).

**RESPONSE:** Admitted that Anderson testified that "generally speaking"—*i.e.*, outside the context of the Durham Defendants' request for a defense and indemnity—an insurer can have a duty to defend even if it is ultimately determined that there is no coverage. The Insurer-Defendants further note that this testimony constitutes an inadmissible legal conclusion that should be disregarded. *See, e.g.*, *Spivey v. Love*, No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3

(S.D. Ill. May 13, 2013) (disregarding legal conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill. Sept. 6, 2019) (refusing to consider statements of fact containing legal conclusions on motion for summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) (noting, on a motion for summary judgment, that "[w]here a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement.").

   Durham SOF No. 100:   Anderson did not make the determination that even though she thought there was no coverage that there was not a duty to defend.  (Exhibit F, deposition of Anderson, p. 61, lines 7 through 13).

   **RESPONSE:** Denied.  Anderson testified that she "drafted a letter that [she] submitted for review, and it's my position they agreed with."  Ex. F at 60:6–9.  The denial letter specifically states that "Ohio Security . . . denies coverage for this Lawsuit and will not participate in the defense of City Wide or pay any settlements or judgments on its behalf."  SUF ¶¶ 20–21.  The testimony cited in Paragraph 100 came in response to a question about the legal standard for determining the duty to defend in Missouri.  On that point, Anderson also testified that she "appl[ied] the policy language to the known facts," which she said were contained in "the emails, the certificate of merit [and] the complaint."  Ex. F at 85:3–13; *see also id.* at 134:9–21.

   Durham SOF No. 101:   Anderson did not make the decision that there wasn't a duty to defend nor did she have the opportunity to make that determination.  (Exhibit F, deposition of Anderson, p. 62, lines 2 through 6; p. 62, lines 11 through 23).

   **RESPONSE:** Denied.  Anderson testified that she "drafted a letter that [she] submitted for review, and it's my position they agreed with."  Ex. F at 60:6–9.  The denial letter specifically states that "Ohio Security . . . denies coverage for this Lawsuit and will not participate in the defense of City Wide or pay any settlements or judgments on its behalf."  SUF ¶¶ 20–21.

The testimony cited in Paragraph 101 came in response to a question about the legal standard for determining the duty to defend in Missouri.  On that point, Anderson also testified that she "appl[ied] the policy language to the known facts," which she said were contained in "the emails, the certificate of merit [and] the complaint."  Ex. F at 85:3–13; *see also id.* at 134:9–21.

Durham SOF No. 102:   Anderson to the best that she could recall did not consider whether or not there was a duty to defend.  (Exhibit F, deposition of Anderson, p. 62, lines 24 through p. 63, line 2).

**RESPONSE:** Denied.  Anderson testified that she "drafted a letter that [she] submitted for review, and it's my position they agreed with."  Ex. F at 60:6–9.  The denial letter specifically states that "Ohio Security . . . denies coverage for this Lawsuit and will not participate in the defense of City Wide or pay any settlements or judgments on its behalf."  SUF ¶¶ 20–21.  The testimony cited in Paragraph 102 came in response to a question about the legal standard for determining the duty to defend in Missouri.  On that point, Anderson also testified that she "appl[ied] the policy language to the known facts," which she said were contained in "the emails, the certificate of merit [and] the complaint."  Ex. F at 85:3–13; *see also id.* at 134:9–21.

Durham SOF No. 103:   Anderson admitted that she did not know if in the Harris case whether any allegedbacteria or fungi wasn't contained in, or on, a good or product intended for bodily consumption. (Exhibit F, deposition of Anderson, p. 68, lines 18 through 22).

**RESPONSE:** Admitted that Anderson testified that the exception could have applied if there was information demonstrating that Harris's bacterial infections arose from "'fungi' or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption," but denied that Anderson testified that she was ever provided such information in either the FAC, the Certificate of Merit, or any conversations with the Durham Defendants.  *See generally* Ex. F.  The Insurer-Defendants further respond that Hilgemann, the Insurer-Defendants' corporate representative and the individual who ultimately decided whether to deny coverage, testified:

So as I said, I based it on the Count 3 [of the FAC] information provided and the Certificate of Merit, in combination, which stated it was failure to properly sanitize the dialysis facility. I did not believe that it involved a good or a product based on the information presented.

SUF ¶¶ 18–19.

Durham SOF No. 104:   Anderson admitted that she did not do any investigation to find out if it was thecase that bacteria or fungi had been on a good or product intended for bodily consumption. (Exhibit F, deposition of Anderson, p. 68, lines 23 through p. 69, line 15).

**RESPONSE:** Denied.   Anderson testified that she was "applying the policy language to the known facts," which she said were contained in "the emails, the certificate of merit [and] the complaint." Ex. F at 85:3–13; *see also id.* at 134:9–21. She further testified that she had discussions with Don Durham, and also with Hilgemann (*id.* at 35–36), all of which are referenced in the claim file. *See generally* Ex. E at OSIC000003–06.

Durham SOF No. 105:   Based on the known information there was a potential according to Anderson thatthe exclusion did not apply since there might have been fungi or bacteria that are, or on, or are contained in, a good or product intended for bodily consumption. (Exhibit F, deposition of Anderson, p. 69, line 22 through p. 70, line 13).

**RESPONSE:** Denied.   Anderson testified that she was "applying the policy language to the known facts," which she said were contained in "the emails, the certificate of merit [and] the complaint." Ex. F at 85:3–13; *see also id.* at 134:9–21. She further testified that she had discussions with Don Durham, and also with Hilgemann (*id.* at 35–36), all of which are referenced in the claim file. *See generally* Ex. E at OSIC000003–06. Based on this investigation, Anderson "drafted a letter that [she] submitted for review, and it's my position they agreed with." Ex. F at 60:6–9. The denial letter specifically states that "Ohio Security . . . denies coverage for this Lawsuit and will not participate in the defense of City Wide or pay any settlements or judgments on its behalf." SUF ¶¶ 20–21. The Insurer-Defendants further respond that Hilgemann, the Insurer-Defendants' corporate representative and the individual who ultimately decided whether to deny coverage, testified:

So as I said, I based it on the Count 3 [of the FAC] information provided and the Certificate of Merit, in combination, which stated it was failure to properly sanitize the dialysis facility.  I did not believe that it involved a good or a product based on the information presented.

SUF ¶¶ 18–19.

Durham SOF No. 106:    Anderson admitted that there was no discussion or analysis in the denial letter as to the language which could potentially negate applicability of the exclusion. (Exhibit F, deposition of Anderson, p. 71, lines 3 through 7).

**RESPONSE:** Admitted that the denial letter did not include a detailed analysis of why the exception to the Bacteria Exclusion did not apply.  The Insurer-Defendants further respond that the letter did reference the exception.  Ex. E at OSIC000115.

Durham SOF No. 107:    At the time the denial letter (Exhibit E) was written the Durham Defendants on May 17, 2017 Hilgerman was a Claims Team Manager and Anderson reported to him.  (Exhibit G, deposition of Hilgerman p. 7, lines 10 through 24).

**RESPONSE:** Admitted.

Durham SOF No. 108:    Hilgerman does not recall editing the denial letter drafted by Anderson. (Exhibit G, deposition of Hilgerman, p. 9, lines 13 through 19).

**RESPONSE:** Admitted that, four years after his coverage analysis, Hilgemann could not recall whether he edited the denial letter.

Durham SOF No. 109:    The Policy does not define bacteria. (Exhibit G, deposition of Hilgerman, p. 34, lines 15 through 17).

**RESPONSE:** Admitted.

**F.    In Order To Protect Themselves The Durham Defendants Entered Into An Agreement With Harris To Limit Recovery To Any Insurance Policy Issued To The Durham Defendants**

Durham SOF No. 110:    At the hearing conducted by the Trial Court on July 30, 2019 the Durham Defendants disclosed to the Trial Court that "the Durham Defendants had entered into an agreement with [Harris], a covenant not to execute and limit recovery. (Exhibit D, Ohio Security Answer, p. 14).

**RESPONSE:** Admitted.  The Insurer-Defendants further respond that the Durham Defendants never disclosed to the trial court that the Covenant Not to Execute and Limit Recovery

was not disclosed to Ohio Security, as required under the statute sanctioning such agreements. *See* SUF ¶ 24 (Durham Defendants admitting they never contacted Ohio Security after May 15, 2017); Mo. Ann. Stat. § 537.065 ("Before a judgment may be entered against any tort-feasor after such tort-feasor has entered into a contract under this section, the insurer or insurers *shall* be provided with *written notice of the execution of the contract* and shall have thirty days after receipt of such notice to intervene as a matter of right in any pending lawsuit involving the claim for damages.") (emphasis added).

  <u>Durham SOF No. 111:</u> The covenant not to execute and limit recovery stated that the Durham Defendantswould not mount a defense before the Trial Court and would not stand in the way and would not prevent any judgment that the Trial Court thought was appropriate to enter. (Exhibit D, Ohio Security Answer, pp. 14-15).

    **RESPONSE:** Admitted.  The Insurer-Defendants further respond that, under the Covenant Not to Execute and Limit Recovery, the Durham Defendants agreed: (1) "to waive a jury trial"; (2) "to take no further action in defense of the Harris claims"; (3) "to file no further pleadings or other motions"; (4) "to present no evidence or cross-examination"; (5) "to file no post-trial motions or appeal from any judgment that may be entered" against them; and (6) to pay Harris ten dollars.  Ex. I.  Despite the fact that Missouri law requires such agreements to be disclosed to the insurer, the Durham Defendants failed to inform Ohio Security of the Covenant Not to Execute and Limit Recovery.  *See* SUF ¶ 24 (Durham Defendants admitting they never contacted Ohio Security after May 15, 2017); Mo. Ann. Stat. § 537.065 ("Before a judgment may be entered against any tort-feasor after such tort-feasor has entered into a contract under this section, the insurer or insurers *shall* be provided with *written notice of the execution of the contract* and shall have thirty days after receipt of such notice to intervene as a matter of right in any pending lawsuit involving the claim for damages.") (emphasis added).

### G.     Judgment Of St. Clair County Circuit Court

Durham SOF No. 112:    The Trial Court adjudged after a trial on the merits that Harris
incurred $330,585.95 in reasonable and customary medical expenses in treating the infections and
infectionrelated complications.  (Exhibit A, Judgment, p. 13).

**RESPONSE:**  Denied that there was a trial on the merits.  The trial transcript spans

just four pages.  Dkt. No. 8-4.  And, as Harris's counsel admitted during this Court's March 23,

2021 hearing, the judgment entered by the trial court was materially identical to the proposed

judgment she submitted.  Dkt. No. 92-1 at 52:4–7.  In addition, the Durham Defendants did not

disclose to the trial court that they failed to inform Ohio Security of the Covenant Not to Execute

and Limit Recovery, as required by Missouri law.  *See* SUF ¶ 24 (Durham Defendants admitting

they never contacted Ohio Security after May 15, 2017); Mo. Ann. Stat. § 537.065 ("Before a

judgment may be entered against any tort-feasor after such tort-feasor has entered into a contract

under this section, the insurer or insurers *shall* be provided with *written notice of the execution of*

*the contract* and shall have thirty days after receipt of such notice to intervene as a matter of right

in any pending lawsuit involving the claim for damages.") (emphasis added).  The Durham

Defendants also failed to disclose that Harris's own medical expert testified that that Harris

suffered from bacterial infections and was treated with antibiotics.  SUF ¶ 40.  To conceal this

from the trial court, Harris and the Durham Defendants redacted all of the expert's testimony

relating to the bacterial nature of the infections and Harris's treatment with antibiotics.  SUF ¶ 41.

Durham SOF No. 113:    A bench trial of Harris' claim against the Durham Defendants,
case number 19-L-234, was conducted on July 30, 2019. (Exhibit A, Order and Judgment of the
Circuit Court (hereinafter referred to as "Judgment"), p. 6).

**RESPONSE:** Admitted.   The Insurer-Defendants further note that the trial

transcript spans just four pages.  Dkt. No. 8-4.  The trial began with Harris's counsel summarily

moving to admit "nine exhibits," including "several evidence depositions and other evidence." *Id.*

Counsel for the Durham Defendants then responded by telling the Court that his clients had

38

"entered into an agreement with [Harris], a covenant not to execute and limit recovery, and that

basically said that [they] would not mount a defense in this action, not stand in the way of any

judgment that [the trial court] thought was appropriate to enter." *Id.* Counsel then added that he

had no objection to "any exhibits being entered into evidence or any decision you enter." *Id.* The

trial concluded shortly thereafter. *Id.*

    Durham SOF No. 114:     Harris's expert, Dr. Ephraim Tsalik, a board-certified infectious disease doctor, who was trained at Duke University testified at trial and authored a report. Dr. Tsalik reviewed themedical records and St. Clair County Health Department investigative file, and he came to the same conclusions as the Health Department, in that Durham was negligent in failing to properly clean the dialysis facility. Dr. Tsalik explained that the facility used vinegar as the primary cleaning agent when there are very well-established guidelines set forth by the CDC which outline which disinfectants are appropriate, and vinegar is not an appropriate cleaning agent. *Id.* He testified that it failed to properly clean all touchable surfaces, in that, there were surfaces which were touched by patients and staff, such as door handles, paper towel dispensers, cleaning cart and chair arms, which weren't regularly disinfected or cleaned. *Id.* Therefore, creating an environment where infection is easily spread between dialysis center. Harris had dialysis at said dialysis center from December 2015 until August 2016. (Exhibit A, Order and Judgment of the Circuit Court (hereinafter referred to as "Judgment"), pp. 6-7).

    **RESPONSE:** Denied. The Durham Defendants accurately quote most of the

above-referenced portion of the October 9, 2019 Judgment entered by the St. Clair County trial

court. What the Durham Defendants misrepresent, is the sentence starting with "Therefore,

creating an environment . . ." That sentence specifically states: "Therefore, creating an

environment where ***infection is easily spread between patients and staff***."

    Durham SOF No. 115:     Harris's expert further opined that as a direct and proximate result of Durham's negligence, Harris suffered infections and infection related complications between February 2016 and August 2016. Harris was hospitalized and received medical care and treatment as a result of the infections and infection related complications on the following dates: 2/20/16 – 3/1/16 (St. Elizabeth's Hospital), 3/11/16 – 3/12/16 (St. Elizabeth's Hospital), 3/22/16 (Memorial Hospital), 5/13/16 – 5/18/16 (Memorial Hospital), 6/18/16 – 7/2/16 (Memorial Hospital), 7/3/16 (Memorial Hospital), and 8/15/16 -8/13/16 (Memorial Hospital). *Id.* Harris underwent multiple procedures asa result of the infections which resulted in a disfigurement depicted in the photographs. (Exhibit A, Judgment, p. 8).

    **RESPONSE:** Admitted that Paragraph 115 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court.

Durham SOF No. 116:    The Trial Court found the only evidence in the case regarding Durham's negligence came from Harris's infectious disease expert, Dr. Tsalik. Dr. Tsalik's report and testimony very clearly stated that Durham was negligent in failing to properly clean the facility. Specifically, Durham used vinegar as the primary cleaning agent, used dirty mop heads, and failed to clean all touchable surfaces.  (Exhibit A, Judgment, pp. 12-13).

**RESPONSE:**  Admitted that Paragraph 116 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court.

Durham SOF No. 117:    Therefore, the Trial Court found Durham negligent in failing to properly clean the facility.  (Exhibit A, Judgment, p. 13).

**RESPONSE:**  Admitted that Paragraph 117 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court.

Durham SOF No. 118:    The Trial Court found that Durham used dirty mop heads. (Exhibit A, Judgment, p. 8).

**RESPONSE:**  Admitted that Paragraph 118 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court.

Durham SOF No. 119:    The Trial Court found the only evidence regarding causation again comes from Harris's expert, Dr. Tsalik. Dr. Tsalik's report and testimony very clearly establish that as a result of Durham's failure to properly clean the facility Harris suffered a series of infections and infection related complications which resulted in damages to Harris. (Exhibit A, judgment, p. 13).

**RESPONSE:**  Admitted that Paragraph 119 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court.

Durham SOF No. 120:    Therefore, the Trial Court found that the proximate cause of Harris's damages was Durham's negligence. (Exhibit A, Order and Judgment of the Circuit Court (hereinafter referred to as "Judgment"), p. 13).

**RESPONSE:**  Admitted that Paragraph 120 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court.

Durham SOF No. 121:   In consideration of all the findings and conclusions detailed above, in addition to the evidence heard at trial and otherwise submitted by the parties, the Trial Court found damages for Harris as follows:

Past Medical Expenses

Harris incurred past medical expenses in the amount of $330,585.95. Defendant has admitted that said medical bills contain charges for services which were reasonable and necessary treatment for conditions occurring as a result of the occurrence which is the subject of the instant suit and are fair and reasonable charges for the services performed. Dr. Tsalik also testified that the medical bills were reasonable and necessary medical expenses as a result of Durham's negligence.

Thus, the Trial Court found the bills totaling $330,585.95 fair, reasonable, customary, and medically necessary for treatment of Harris's infections.

Disfigurement

Disfigurement is recognized as a separate element of compensation damages in Illinois.

*Holston v. Sisters of the Third Order of St. Francis*, 650 N.E.2d 985, 997 (1995). Dr. Tsalik testified that Harris has incurred disfigurement, in the form of scars on his chest and groin, as a result of the infections which are permanent. Harris presented photographic evidence of the scars.

For disfigurement, Harris was entitled to $750,000.00.

Loss of a Normal Life

Loss of a normal life means the temporary or permanent diminished ability to enjoy life. This includes a person's inability to pursue the pleasurable aspects of life. *Smith v. City of Evanston*, 631 N.E.2d 1269 (1st Dist. 1994). Harris spent forty-three (43) nights in the hospital and had nine (9) surgeries between February 2016 and August 2016. During this time, Harris was confined to a hospital bed unable to enjoy his life. The evidence very clearly establishes that the infections caused Harris to suffer loss of a normal life.

For loss of a normal life, Harris is entitled to $500,000.00. Judgment, p. 15.

Pain and Suffering

Pain and suffering are compensable elements of damages. *Donk Bros. Coal & Coke Co. v. Thil*, 81 N.E. 857, 860 (1907). As previously mentioned, Harris spent forty-three (43) nights in the hospital and underwent nine (9) surgeries. Harris testified that during these procedures he wouldn't be totally "asleep". Due to the possibility of nerve damage and paralysis, he could not be completely sedated. Harris testified that sometimes the catheter sites would develop so much scar tissue that a new site

41

would have to be used which would result in a scar. Harris testified that he's embarrassed by these scars.

For pain and suffering, Harris was entitled to $500,000.00

Total Damages

Past Medical Expenses ----------------------------------------------$330,585.95

Disfigurement--------------------------------------------------------$750,000.00

Loss of a Normal Life ----------------------------------------------$500,000.00

Pain and Suffering--------------------------------------------------$500,000.00

Total Damages                                                    $2,080.585.95

In reaching each of the itemized damages as described above, the Court considered, and connected to each item of damage, the facts and evidence presented to the Court during the bench trial in this matter.

Conclusion

Respectfully, Judgment was entered in favor of Tommy Harris and against defendants in accordance with this Order. (Exhibit A, Judgment, pp. 13-15).

**RESPONSE:** Admitted that Paragraph 121 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court.

**H.     Findings By The Trial Court As To The Actions Of Liberty Mutual**

Durham SOF No. 122:     It was the Trial Court's understanding that Liberty Mutual failed to defendDurham under a reservation of rights. (Exhibit A, Judgment, p. 10).

**RESPONSE:** Admitted that Paragraph 122 accurately quotes an excerpt from the

October 9, 2019 Judgment entered by the St. Clair County trial court. Denied that this finding is

binding on the Insurer-Defendants, since the Court already ruled that the Insurer-Defendants are

not estopped from litigating issues of coverage. *See* Dkt. No. 63 at 6–8. The Insurer-Defendants

further note that there is no record evidence that Liberty Mutual underwrote the Ohio Security

Policy. SUF ¶ 49.

Durham SOF No. 123:     It was the Trial Court's understanding that Liberty Mutual failed to file adeclaratory judgment claim against Durham. (Exhibit A, Judgment, p. 10).

**RESPONSE:**  Admitted that Paragraph 123 accurately quotes an excerpt from the October 9, 2019 Judgment entered by the St. Clair County trial court.  Denied that this finding is binding on the Insurer-Defendants, since the Court already ruled that the Insurer-Defendants are not estopped from litigating issues of coverage.  *See* Dkt. No. 63 at 6–8.  The Insurer-Defendants further note that there is no record evidence that Liberty Mutual underwrote the Ohio Security Policy.  SUF ¶ 49.

Durham SOF No. 124:   The Trial Court entered judgment against Durham in the underlying action. Therefore, any future declaratory judgment filed by Liberty Mutual is untimely as a matter of law.  (Exhibit A, Judgment, p. 10).

**RESPONSE:**  Admitted that Paragraph 124 accurately quotes an excerpt from the October 9, 2019 Judgment entered by the St. Clair County trial court.  Denied that this finding is binding on the Insurer-Defendants, since the Court already ruled that the Insurer-Defendants are not estopped from litigating issues of coverage.  *See* Dkt. No. 63 at 6–8.  The Insurer-Defendants further note that there is no record evidence that Liberty Mutual underwrote the Ohio Security Policy.  SUF ¶ 49.

Durham SOF No. 125:   The Trial Court finds that Liberty Mutual breached its duty to defend Durham.(Exhibit A, Judgment, p. 10).

**RESPONSE:**  Admitted that Paragraph 125 accurately quotes an excerpt from the October 9, 2019 Judgment entered by the St. Clair County trial court.  Denied that this finding is binding on the Insurer-Defendants, since the Court already ruled that the Insurer-Defendants are not estopped from litigating issues of coverage.  *See* Dkt. No. 63 at 6–8.  The Insurer-Defendants further note that there is no record evidence that Liberty Mutual underwrote the Ohio Security Policy.  SUF ¶ 49.

## II.   RESPONSES TO DEFENDANT TOMMY HARRIS' STATEMENT OF FACTS ("SOF")

Harris SOF No. 1:     On April 19, 2017, Plaintiff filed an amended Complaint in the underlying case, *Tommy Harris v. Renal Life Link, Inc., et al.,* No. 17-L-7, in the Twentieth Judicial Circuit, St. Clair County, Illinois, alleging that Durham Enterprises, Inc. and Don Durham ("Durham") failed to properly clean a dialysis center, causing plaintiff to suffer injury (Docs. 55, p.5; 56, p. 5).

**RESPONSE:** Admitted that Paragraph 1 accurately quotes an excerpt from the

FAC.

Harris SOF No. 2:     Durham tendered the claim to its insurer, but, by May 15, 2017 letter, Durham's insurer denied coverage (Doc.56, p.6). Ultimately, Plaintiff's action against Durham was resolved in a bench trial in St. Clair County resulting in judgment against Durham and for Plaintiff in the amount of $2,080,585.95 (Doc.56,p.7). The St. Clair County Court also determined that Durham's insurer had breached its duty to defend the suit; the instant action arose from litigation of and Liberty Mutual Insurance Company and Ohio Security Insurance Company's ("the Insurers'"[5])removal of that issue (Doc.1).

**RESPONSE:** Admitted that: Durham tendered a request for a defense and

indemnity to Ohio Security; that the request was denied; that Harris's claims against Durham were

resolved in an uncontested bench trial that resulted in a judgment of $2,080,585.95; and that the

October 9, 2019 Judgment entered by the St. Clair County trial court made findings as to the

Insurer-Defendants' purported breach of their duty to defend.  The Insurer-Defendants deny that

the findings regarding the duty to defend are binding on the Insurer-Defendants, since the Court

already ruled that the Insurer-Defendants are not estopped from litigating issues of coverage. *See*

Dkt. No. 63 at 6–8.

---

[5]      Ohio Security Insurance Company is the underwriting company inside the Liberty Mutual Insurance Company group. Deposition Joshua R. Hilgerman, April 30, 2021, 13:2-5. The entities are represented by the same counsel in this action. In its filings to-date, Liberty Mutual has disclaimed participation in issuing the Durham policy and in denying the Durham claim at issue here. This motion does not address which corporate entity enacted the policy or the relative liability of one corporation versus the other, but instead addresses the insurers' duty to defend triggered by Plaintiff's suit against the insured, Durham, pursuant to the policy issued by Liberty Mutual and/or Ohio Security (collectively, for purposes of this motion, "the Insurers").

Harris SOF No. 3:      The parties are now briefing for summary judgment the issue of the Insurers' duty to defend Durham as that duty existed when Durham was sued in Plaintiff's underlying Illinois negligence case. *See* Docs. 90, 91, 103.

**RESPONSE:** Admitted that the parties are briefing the issue of whether the Insurer-Defendants had a duty to defend, but denied that this duty existed.  *See* Dkt. No. 106.

The Insurers' Obligation Under Missouri Law to Ascertain
Facts Giving Rise to Any Possible Duty to Defend

Harris SOF No. 4:      The parties agree that Missouri law applies to the question of whether the Insurers had a duty to defend Durham.

**RESPONSE:** Admitted.

Harris SOF No. 5:      Under Missouri law, the duty to defend is broader than the duty to indemnify. *Allen v. Bryers,* 512 S.W.3d 17, 31 (Mo. 2016) *as modified* (Apr. 4, 2017). The insurer has a duty to defend its insured "whenever there is a potential or possible liability to pay". *McCormack Baron Mgmt. Services, Inc. v. Am. Guarantee & Liab. Ins. Co.,* 989 S.W.2d 168, 170 (Mo. 1999). Even if the complaint (in Missouri, the 'petition') states claims that are beyond policy coverage, where the complaint also alleges any potentially-insured claims, the insurer has a duty to defend. *Murray-Kaplan v. NEC Ins. Inc.,* 617 S.W3d 485, 493 (Mo. Ct. App. ED 2021) ("[T]he insurer's duty to defend compels it to defend cases including uncovered claims even though it is highly unlikely the sole avenue of potential coverage will be ultimately proven.").

**RESPONSE:** Paragraph 5 sets forth a number of legal conclusions, not statements of material facts.  The Court should therefore disregard Paragraph 5.  *See, e.g.*, *Spivey v. Love*, No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3 (S.D. Ill. May 13, 2013) (disregarding legal conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill. Sept. 6, 2019) (refusing to consider statements of fact containing legal conclusions on motion for summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) (noting, on a motion for summary judgment, that "[w]here a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement.").

Harris SOF No. 6:      "To extricate itself from the duty to defend the insured, the insurance company must prove that there is ***no possibility*** of coverage." *Allen v. Bryers,* 512 S.W.3d at 31, *internal quotations omitted, emphasis in original.* The burden toprove 'no possible coverage' is on the insurer because "[t]o suggest that the insured must prove the insurer's obligation to pay before the insurer is required to provide a defense would make [the duty to defend] provision a hollow promise." *McCormack,* 989 S.W.2d at 170, *internal quotations omitted.*

**RESPONSE:** Paragraph 6 sets forth a number of legal conclusions, not statements

of material facts.  The Court should therefore disregard Paragraph 6.  *See, e.g.*, *Spivey v. Love*,

No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3 (S.D. Ill. May 13, 2013) (disregarding legal

conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach*

*v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report*

*and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill.

Sept. 6, 2019) (refusing to consider statements of fact containing legal conclusions on motion for

summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill.

2012) (noting, on a motion for summary judgment, that "[w]here a party offers a legal conclusion

or statement of fact without proper evidentiary support, the Court will not consider that

statement.").

Harris SOF No. 7:      If the insurer is relying on a policy exclusion to deny its duty to defend, the insurer has the burden of establishing that the exclusion applies, and that, if applied, the exclusion precludes any possibility of coverage. *Custom Hardware Eng'g & Consulting, Inc. v. Assurance Co. of Am.,* 295S.W.3d 557, 561 (Mo. Ct. App. ED 2009); *see also Friar v. Statutory Trustees of Kirkwood Sports Ass'n, Inc.,* 959 S.W.2d 808, 809 (Mo. Ct. App. ED 1997) ("Exclusionary clauses in insurance policies are to be strictly construed against the insurer.").

**RESPONSE:** Paragraph 7 sets forth a number of legal conclusions, not statements

of material facts.  The Court should therefore disregard Paragraph 7.  *See, e.g.*, *Spivey v. Love*,

No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3 (S.D. Ill. May 13, 2013) (disregarding legal

conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach*

*v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report*

*and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill.

Sept. 6, 2019) (refusing to consider statements of fact containing legal conclusions on motion for summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) (noting, on a motion for summary judgment, that "[w]here a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement.").

Harris SOF No. 8:     If the potential for coverage is a close call, the insured gets the benefit of the doubt. The Seventh Circuit Court of Appeals recognizes that under Missouri law, "the burden of uncertainty as to a policy's coverage [is] on the insurer. Any ambiguity as to coverage at the pre-trial stage is to be resolved in favor of the insured." *Ott v. Crews*, 830 F.2d 773, 778 (7th Cir. 1987); *see also Carboline Co. v. Home Indem. Co.,* 522 F.2d 363, 366 (7th Cir. 1975), *citing Missouri law* ("it has been universally recognized that an insurer has a duty to defend under a defense clause if there is doubt whether the claim comes within the coverage of the policy.").

**RESPONSE:**  Paragraph 8 sets forth a number of legal conclusions, not statements of material facts.  The Court should therefore disregard Paragraph 8.  *See, e.g.*, *Spivey v. Love*, No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3 (S.D. Ill. May 13, 2013) (disregarding legal conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill. Sept. 6, 2019) (refusing to consider statements of fact containing legal conclusions on motion for summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) (noting, on a motion for summary judgment, that "[w]here a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement.").

Harris SOF No. 9:     The insurer's duty to defend is triggered by the ***possibility*** of coverage, and in determining whether a claim is potentially within the scope of the policy, the insurer must consider the petition and reasonably ascertainable facts. *See Truck Ins. Exch. V. Prairie Framing, LLC,* 162 S.W.3d 64, 79 (Mo.Ct. App. WD 2005) ("even though the pleadings do not show coverage, where known or reasonably ascertainable facts become available that show coverage, the duty to defend devolves upon the insurer."). As the Missouri Supreme Court states:

47

> Beyond the facts alleged in the plaintiff's petition, the insurer also has a duty to defend if facts that are known to the insurer or that are reasonably apparent to the insurer, at the commencement of the suit establish a potential for coverage.

*Allen v. Cont'l W. Ins. Co.,* 436 S.W.3d 548, 552 (Mo. 2014). The insurer "c[an] not safely ignore actual facts known to it or which should have been known from reasonable investigation." *Hocker Oil Co., Inc. v. Barker-Phillips-Jackson, Inc.,* 997 S.W.2d 510, 520 (Mo. Ct. App. SD 1999), *citing Zipkin v. Freeman,* 436 S.W.2d 753 (Mo banc 1968).

**RESPONSE:** Paragraph 9 sets forth a number of legal conclusions, not statements of material facts.  The Court should therefore disregard Paragraph 9.  *See, e.g.*, *Spivey v. Love*, No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3 (S.D. Ill. May 13, 2013) (disregarding legal conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill. Sept. 6, 2019) (refusing to consider statements of fact containing legal conclusions on motion for summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) (noting, on a motion for summary judgment, that "[w]here a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement.").

Harris SOF No. 10:   To determine whether an insurer had a duty to defend, Missouri courts compare the insurance policy language with both facts alleged in the petition and facts known or reasonably ascertainable to the insurer. *Allen v. Bryers,* 512 S.W.3d at 31.

**RESPONSE:** Paragraph 10 sets forth a number of legal conclusions, not statements of material facts.  The Court should therefore disregard Paragraph 10.  *See, e.g.*, *Spivey v. Love*, No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3 (S.D. Ill. May 13, 2013) (disregarding legal conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill. Sept. 6, 2019) (refusing to consider statements of fact containing legal

conclusions on motion for summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) (noting, on a motion for summary judgment, that "[w]here a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement.").

    The Insurance Policy Language

    Harris SOF No. 11:    When Missouri courts interpret insurance policy language to determine whether coverage exists and whether exclusions apply, terms are given their ordinary meaning – the meaning that would be attached by an ordinary person of average understanding – unless it plainly appears that a technical meaning was intended. *Mendenhall v. Property Cas. Ins. Co. of Hargord,* 375 S.W.3d 90, 92 (Mo banc 2012). Insurance policy terms are ambiguous when the phrase or term is "reasonably open to different constructions." *Id., internal quotation omitted.* "Ambiguities in the meaning of an insurance policy are resolved in favor of the insured, and exclusionary clauses are strictly construed against the drafter." *Id.*

    **RESPONSE:** Paragraph 11 sets forth a number of legal conclusions, not statements of material facts.  The Court should therefore disregard Paragraph 5.  *See, e.g.*, *Spivey v. Love*, No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3 (S.D. Ill. May 13, 2013) (disregarding legal conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill. Sept. 6, 2019) (refusing to consider statements of fact containing legal conclusions on motion for summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) (noting, on a motion for summary judgment, that "[w]here a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement.").

    Harris SOF No. 12:    Here, the Insurers issued Durham a commercial general liability insurance policy, number BKS (16)57078432 ("the Policy"), with a policy period from December 30, 2015 to December 30, 2016 (Doc.56, p.5). The Policy is in the record at Doc. 56-2.

    **RESPONSE:** Denied.  The Ohio Security Policy was issued by (*i.e.*, underwritten by) Ohio Security.  SUF ¶ 49.

**Harris SOF No. 13:**    The Policy's Commercial General Liability Coverage Form states, in pertinent part:

**SECTION I – COVERAGES**
**COVERAGE A – BODILY INJURY AND PROPERTY**
**DAMAGES LIABILITY**

**1.      Insuring Agreement**

**a.**      We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.
(Doc. 56-2, p. 29);

**e.**      Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".
(Doc. 56-2, p. 30);

**SECTION V – DEFINITIONS**

**3.**      Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.
(Doc. 56-2, p. 42);

**2.,      Exclusions**  This insurance does not apply to:

**Fungi or Bacteria**

**1.**      "Bodily injury" or "property damage" which would not have occurred, in whole or  in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building  or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury  or damage.

**2.**      Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, re-mediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**C.**      The following definition is added to the **Definitions** Section:
"Fungi" means any type or form of fungus, including mold or mildew and any

mycotoxins, spores, scents or by-products produced or released by fungi.

(Doc. 56-2, p. 51)

**RESPONSE:** Denied.   The Bacteria Exclusion is not contained in the Ohio

Security Policy's Section I Coverage Part.  Rather, it is included as an endorsement to the Ohio

Security Policy.

Harris SOF No. 14:   Of note is the "consumption exception" to the "Fungi or Bacteria
Exclusion": if the bodily injury arose in whole or in part from ingestion/contact/exposure/existence
of bacteria **onor contained in a 'good' or 'product' intended for bodily consumption**, then the
"Fungi or Bacteria Exclusion" does ***not*** apply and the bodily injury ***is*** covered by the policy. The
Policy does not specifically define "bacteria", "consumption", "good", or "product".

**RESPONSE:** Admitted that the Ohio Security Policy does not define "bacteria,"

"consumption," "good," or "product."  Denied that Paragraph 14 accurately quotes the exception.

Specifically, the exception provides:  "This exclusion does not apply to any 'fungi' or bacteria that

are, are on, or are contained in, a good or product intended for bodily consumption."  SUF ¶ 15.

The statement that "the 'Fungi or Bacteria Exclusion' does ***not*** apply and the bodily injury ***is***

covered by the policy" is a legal conclusion which must be disregarded.  *See, e.g.*, *Spivey v. Love*,

No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3 (S.D. Ill. May 13, 2013) (disregarding legal

conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach*

*v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report*

*and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill.

Sept. 6, 2019) (refusing to consider statements of fact containing legal conclusions on motion for

summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill.

2012) (noting, on a motion for summary judgment, that "[w]here a party offers a legal conclusion

or statement of fact without proper evidentiary support, the Court will not consider that

statement.").

<u>Under the Facts Alleged in the Complaint, the PolicyCovered Plaintiff's Claim Against Durham</u>

<u>Harris SOF No. 15:</u>   When evaluating an insurer's duty to defend pursuant toMissouri law, the reviewing court "must take the petition's allegations as true, grant them their broadest possible intendment, and construe all allegations favorably to the pleader." *Murray-Kaplan,* 617 S.W.3d at 493.

**RESPONSE:** Paragraph 15 sets forth a number of legal conclusions, not statements of material facts.  The Court should therefore disregard Paragraph 15. *See, e.g.*, *Spivey v. Love*, No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3 (S.D. Ill. May 13, 2013) (disregarding legal conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill. Sept. 6, 2019) (refusing to consider statements of fact containing legal conclusions on motion for summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) (noting, on a motion for summary judgment, that "[w]here a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement.").

<u>Harris SOF No. 16:</u>   Durham was first named in the amended complaint filedin St. Clair County Case No. 17-L-7 on April 19, 2017. That complaint is in the record in this case at Doc. 56-1, pp.17-22.

**RESPONSE:** Admitted.

<u>Harris SOF No. 17:</u>   The complaint alleged that Durham provided commercial cleaning services to the dialysis center at which Plaintiff received treatment (Doc.56-1, pp.17-18). The complaint stated that Durham "negligently and carelessly failed to properly cleanand sanitize said dialysis center [and] [t]hat as a direct and proximate result … plaintiff suffered numerous infections on or about February 2016, March 2016, May 2016, June 2016, and August2016, and has suffered permanent pain, mental anguish, disability and disfigurement." (Doc.56-1, pp.21-22).

**RESPONSE:** Admitted.

<u>Harris SOF No. 18:</u>   Less than one month from the time Plaintiff filed hisaction against Durham, Insurers denied coverage for the suit (Doc. 56-1, p.25).

**RESPONSE:** Denied.  The denial letter was sent on behalf of Ohio Security, as indicated by the letter, which identifies Ohio Security as the underwriting company, and specifically states that "Ohio Security . . . denies coverage for this Lawsuit and will not participate in the defense of City Wide or pay any settlements or judgments on its behalf."  SUF ¶¶ 20–21. There is no evidence that Liberty Mutual or Ohio Casualty issued the Ohio Security Policy.  SUF ¶ 49.

Harris SOF No. 19:   Under the pleaded facts, the Policy clearly applies; Durham's negligent work caused Tommy Harris bodily injury.

**RESPONSE:** Denied for the reasons set forth in Dkt. No. 106.  In any event, Paragraph 19 sets forth a number of legal conclusions, not statements of material facts.  The Court should therefore disregard Paragraph 19.  *See, e.g.*, *Spivey v. Love*, No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3 (S.D. Ill. May 13, 2013) (disregarding legal conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill. Sept. 6, 2019) (refusing to consider statements of fact containing legal conclusions on motion for summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) (noting, on a motion for summary judgment, that "[w]here a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement.").

Harris SOF No. 20:   The Insurers did not even premise their refusal to defend on a contention that the facts alleged in the **complaint** fell outside policy coverage (Doc. 56-1, pp.25-29). Instead, the Insurers looked to verbiage in the certificates of merit accompanying the complaint characterizing Tommy Harris's injuryas "significantly increased risk of bacterial sepsis and … grampositive and gram negative sepsis" (Doc. 56 pp.13-14). From that, Insurers concluded "the plaintiff alleges damages as a result of bacterial infections, there is no coverage for the presented claim" under the Policy's "Fungi or Bacteria Exclusion" (Doc. 56-1, p.28).

**RESPONSE:** Denied.  The denial letter was sent on behalf of Ohio Security, as indicated by the letter, which identifies Ohio Security as the underwriting company, and

specifically states that "Ohio Security . . . denies coverage for this Lawsuit and will not participate in the defense of City Wide or pay any settlements or judgments on its behalf."  SUF ¶¶ 20–21. There is no evidence that Liberty Mutual or Ohio Casualty issued the Ohio Security Policy.  SUF ¶ 49.  The Insurer-Defendants also deny that the denial letter was not based on the complaint.  For example, Hilgemann testified that the conclusion that there was no possibility of coverage was "straightforward . . . based on the information provided," which included the FAC, affidavit and Certificate of Merit.  SUF ¶ 17.  With regard to the exception, Hilgemann testified:

> So as I said, I based it on the Count 3 [of the FAC] information provided and the Certificate of Merit, in combination, which stated it was failure to properly sanitize the dialysis facility.  I did not believe that it involved a good or a product based on the information presented.

SUF ¶ 19.

Harris SOF No. 21:    Though Missouri law applies to determination of Insurers' duty to defend, the underlying action was an Illinoiscase which, in addition to the negligence asserted against Durham, alleged negligent operation of a dialysis facility (Doc56-1, pp.17-22). In Illinois, any action seeking damages for injuries by reason of healing art malpractice is required to include an affidavit attached to the complaint. 735 ILCS 5/2-622. Plaintiff therefore attached affidavits stating that therewas a reasonable and meritorious cause for filing the action against the dialysis center (Doc. 56 pp.13-14).

RESPONSE:  Admitted that: (1) Missouri law applies; (2) the underlying action was filed in Illinois and alleged negligence against Durham, and negligent operation of a dialysis facility against other parties; and (3) that Plaintiff attached affidavits to the FAC.  The remainder of Paragraph 21 sets forth a number of legal conclusions which should be disregarded.  *See, e.g.*, *Spivey v. Love*, No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3 (S.D. Ill. May 13, 2013) (disregarding legal conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill. Sept. 6, 2019) (refusing to consider statements of fact containing legal conclusions on motion for summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F.

Supp. 2d 764, 771 (N.D. Ill. 2012) (noting, on a motion for summary judgment, that "[w]here a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement.").

Harris SOF No. 22:   An Illinois section 5/2-622 affidavit is not part of the complaint. *Garrison v. Choh*, 719 N.E.2d 237, 240 (Ill.Ct.App. 1st Dist. 1999). The health professional's affidavit does not "bolster or enhance" the complaint, it merelysatisfies a requirement of the Illinois Code. *Id.* at 243. The health professional's stated reasons for determining a meritorious claim exists "cannot be said to be incorporated intothe complaint for purposes of determining the misconduct of the defendant for which the plaintiff seeks recovery. To hold otherwise would make the health professional a drafter of the pleading". *Id.*

**RESPONSE:** Paragraph 22 sets forth a number of legal conclusions, not statements of material facts.  The Court should therefore disregard Paragraph 22.  *See, e.g.*, *Spivey v. Love*, No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3 (S.D. Ill. May 13, 2013) (disregarding legal conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill. Sept. 6, 2019) (refusing to consider statements of fact containing legal conclusions on motion for summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) (noting, on a motion for summary judgment, that "[w]here a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement.").

Harris SOF No. 23:   Under Missouri law, insurers must defend if the (to- be-broadly-interpreted) allegations in the complaint give rise to even the *possibility* of existing coverage. The insurer must prove that a (to-be-narrowly-construed) policy exception appliesto the claim *and* obviates any chance of coverage. Here, the Insurers presumed the fungi exception applied and denied coverage based on the word "bacterial" appearing in a document outside of the complaint.

**RESPONSE:** Denied that the "Insurers presumed the fungi exception applied and denied coverage based on the word 'bacterial' appearing in a document outside of the complaint." The denial letter was sent on behalf of Ohio Security, as indicated by the letter, which identifies

Ohio Security as the underwriting company, and specifically states that "Ohio Security . . . denies coverage for this Lawsuit and will not participate in the defense of City Wide or pay any settlements or judgments on its behalf."  SUF ¶¶ 20–21.  There is no evidence that Liberty Mutual or Ohio Casualty issued the Ohio Security Policy.  SUF ¶ 49.

The Insurer-Defendants also note that Hilgemann testified that the conclusion that there was no possibility of coverage was "straightforward . . . based on the information provided," which included the FAC, affidavit and Certificate of Merit.  SUF ¶ 17.  With regard to the exception, Hilgemann testified:

> So as I said, I based it on the Count 3 [of the FAC] information provided and the Certificate of Merit, in combination, which stated it was failure to properly sanitize the dialysis facility.  I did not believe that it involved a good or a product based on the information presented.

SUF ¶ 19.

The remainder of Paragraph 23 sets forth a number of legal conclusions that should be disregarded.  *See, e.g.*, *Spivey v. Love*, No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3 (S.D. Ill. May 13, 2013) (disregarding legal conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill. Sept. 6, 2019) (refusing to consider statements of fact containing legal conclusions on motion for summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) (noting, on a motion for summary judgment, that "[w]here a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement.").

The Policy's 'Consumption' Exception Further Reinforces the Insurers' Duty to Defend Durham

Harris SOF No. 24:    The fungi exclusion is inapplicable if the claim arises from exposure to bacteria that are on, or are contained in, a good or product intended for bodily consumption (Doc. 56-1, p.27).

**RESPONSE:** Denied that Paragraph 14 accurately quotes the exception. Specifically, the exception provides: "This exclusion does not apply to any 'fungi' or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption." SUF ¶ 15. In any event, the statement that "[t]he fungi exclusion is inapplicable if the claim arises from exposure to bacteria that are on, or are contained in, a good or product intended for bodily consumption" is a legal conclusion which should be disregarded. *See, e.g.*, *Spivey v. Love*, No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3 (S.D. Ill. May 13, 2013) (disregarding legal conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill. Sept. 6, 2019) (refusing to consider statements of fact containing legal conclusions on motion for summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) (noting, on a motion for summary judgment, that "[w]here a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement.").

Harris SOF No. 25:    The Insurers **assumed** that dialysis treatment does not involve consumption of a good or product and, based on that assumption, conclusively determined that the consumption exception could not apply and the fungi exclusion definitively did apply, foreclosing the possibility of coverage. As Insurers' 30(b)(6) witness, Joshua Hilgerman testified:

Q.      Well, how did Mr. Harris – how did Mr. Harris become infected?

A.      I'm not – I'm not sure. I mean, I'm basing it off of the Certificate of Merit.

Q.      Well, what does the Certificate of Merit state?

A.      If we go back to the Certificate of Merit, I can read it. I think it's 107, states that he – I mean, would you like me to read it again?

Q.      No. I'm just trying to understand, what is your understanding of how Mr. Harris became infected?

A.      Through the improper failure to sanitize the dialysis facility.

Q.      Okay. And what within the dialysis facility did he come in contact with, or consume, thatcaused him to suffer an infection?

A.      I'm not sure. … I mean, yeah, there's nothingwithin this that would lead me to believe thathe consumed anything, but I'm not sure.

*Deposition of Joshua R. Hilgerman,* April 30, 2021, 74:5-21, 24-25;

A.      [M]y general understanding of a dialysis center is it's for treatment of kidney disorder.

Q.      And how do they treat the kidney disorder using dialysis?

A.      They flush out toxins and things of that nature.

Q.      And how do they do that?

A.      I mean, I don't -- I don't work in a dialysis center. I'm not an expert in dialysis. I -- I don't know.

Q.      For example, do they inject any sort of fluid into the patient during the process of dialysis?

A.      My general understanding is yes.

Q.      Okay. And is that fluid maintained in the dialysis center?

A.      As I understand it, yes.

Q.      Okay. So if that fluid is contaminated, and then injected into the dialysis patient, couldn't that potentially fall within the exception to the exclusion?

…

A.      I don't know.

Q.      You would agree that's certainly possible, right?

…

A.      I'm not certain.

58

Q.     What could you do to become certain, sir?

A.     Likely hire an expert.

…

Q.     Have you ever consulted with a medical doctor regarding a claim? … Sir, did you have the option available to you to consult a medical doctor, if you needed further information, regarding the process of dialysis, and whether or not that could amount to bodily consumption of some good or product?

…

A.     Yes.

…

Q.     So you would agree with me that the improper sanitation of a dialysis facility could involve the improper sanitation of goods or products that are intended for bodily consumption?

…

A.     I'm not sure.

…

Q.     So you didn't check out, didn't ask the Durham defendants what kinds of goods or products that were intended for bodily consumption were in the facility, correct?

…

A.     Correct.

…

Q.     [Y]ou are aware that infections can be caused by things other than bacteria and fungi, correct?

A.     Yes.

*Id.* 75:8-25; 76:1-2, 16-18, 20-23; 77:3-4, 8-12, 24; 84:14-18, 20; 114:13-19; 116:23-25; 117:1-2.

**RESPONSE:** Denied.  The denial letter was sent on behalf of Ohio Security, as indicated by the letter, which identifies Ohio Security as the underwriting company, and specifically states that "Ohio Security . . . denies coverage for this Lawsuit and will not participate

in the defense of City Wide or pay any settlements or judgments on its behalf." SUF ¶¶ 20–21.

There is no evidence that Liberty Mutual or Ohio Casualty issued the Ohio Security Policy. SUF

¶ 49.

The Insurer-Defendants also note that Hilgemann testified that the conclusion that there

was no possibility of coverage was "straightforward . . . based on the information provided," which

included the FAC, affidavit and Certificate of Merit. SUF ¶ 17. With regard to the exception,

Hilgemann testified:

> So as I said, I based it on the Count 3 [of the FAC] information provided and the
> Certificate of Merit, in combination, which stated it was failure to properly sanitize
> the dialysis facility. I did not believe that it involved a good or a product based on
> the information presented.

SUF ¶ 19.

Paragraph 25 also misrepresents Hilgemann's deposition transcript. Specifically,

Paragraph 25 omits the following:

- omits the objection on pg. 74 noting that counsel's question assumed facts not in
evidence;

- omits the following question and answer on pg. 75, which led to the discussion
cited in Paragraph 25:

> Q. (By Ms. Unsell) So tell me everything you know about the process of
> dialysis.
> A. Can you read back the question? You'd like me to tell you everything
> that I know about the process of dialysis?
> Q. Yes.
> A. Is that the specific question? . . .

- omits the objection on pg. 76 noting that counsel's question called for speculation
and misstated the record evidence;

- omits the objection on pg. 76 noting that counsel's question had been asked and
answered;

- omits the following question and answer on pgs. 76–77, which demonstrates that
Hilgemann did not have access to doctors employed by Liberty Mutual Insurance
Company, contrary to the representations in Paragraph 25:

Q. Do you have doctors, medical doctors, who are employed by Liberty Mutual Insurance Company with which you can consult regarding medical issues?
A. *No*.

- omits the objection to the form of the question on pg. 77 regarding the availability of medical doctors with whom Hilgemann could have consulted;

- omits the entirety of pages 78–80, in which a number of objections are made, and Hilgemann testifies that: (1) "***based on the information presented, I did not believe that the exception applied***"; (2) that the basis for his decision was "the information presented within the Complaint and the Certificate of Merit"; and (3) "***So as I said, I based it on the Count 3 information provided and the Certificate of Merit, in combination, which stated it was failure to properly sanitize the dialysis facility. I did not believe that it involved a good or a product based on the information presented***";

- omits the below questions and answers on pgs. 82–84:

    Q. So if the documents you reviewed don't state that one way or the other, then wouldn't you agree that that was certainly a possibility? ***And if it wasn't a possibility, what information were you using to make that determination***?
    A. That there wasn't a good or product that was consumed;

    \*      \*      \*

    Q. Well, certainly improperly sanitizing the dialysis facility could include the improper sanitation of goods or products intended for bodily consumption, correct?
    A. ***I don't believe so***;
    Q. And why not, sir?
    A. ***Based on the information that's provided in the Complaint and the Certificate of Merit***;

- omits the objections on pg. 84–85 that counsel's questions had repeatedly been asked and answered, that her questions were argumentative, that she was badgering the witness;

- omits the various objections set forth on pgs. 114–17.

Ex. G at 75–117.

Harris SOF No. 26:    The complaint did not state or allege that Plaintiff's infections were of bacterial origin. But even if Insurers had been justified in assuming that bacteria caused the injury, they had a duty to defend pursuant to the consumption exception. Though Insurers failed to perform even a cursory investigation into the mechanism of Plaintiff's dialysis treatment, they nevertheless acknowledge that 'something' at the dialysis facility was inserted into Plaintiff's body

to 'flush out toxins.' That was enough to trigger the duty to defend. The consumption exception is not limited to products that are eaten.*See Ganesh v. Argonaut Great Central Ins. Co.,* No.4:13-cv-00398- SMR-HCA, 2015 WL 12517436 *13 (June 15, 2015 S.D. Iowa) ("Because the Consumption Exception is susceptible of more than one reasonable interpretation, it is ambiguous … Because the Consumption Exception is ambiguous, the Court must adopt the construction most favorable to [the insured]."). In *Nationwide Mut. Fire Ins. Co. v. Dillard House, Inc.,* for example, the United States District Court for the Northern District of Georgia found that a nearly-identically worded consumption exception applied and triggered the duty to defend the insured from claims that bacteria in the water of a hotel's hot tub led to the plaintiff's death by Legionnaire's disease. 651 F.Supp.2d1367, 1376-77 (N.D. Georgia 2009). The court found that the water in the hot tub was a "good" intended for "consumption" because, using the language of one of WEBSTER's definitions for "consumption", water in a hot tub is "intended for the utilization .. in the satisfaction of wants … relating to the body." *Id.* at 1378; *Westport Ins. Corp. v. VN Hotel Group, LLC,*761 F.Supp.2d 1337 (M.D. Florida 2010), *accord.*

        **RESPONSE:** Admitted that the FAC did not specifically allege that Plaintiff's infections were of bacterial origin, though the Certificate of Merit plainly did. SUF ¶ 8. The remainder of this allegation is denied for the reasons set forth in response to Paragraph Nos. 1–25 (in response to Harris's statement of facts), and Paragraph Nos. 25–109 (in response to the Durham Defendants' statement of facts).  In any event, every sentence of Paragraph 26, other than the first sentence, contains legal conclusions which should be disregarded.  *See, e.g.*, *Spivey v. Love*, No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3 (S.D. Ill. May 13, 2013) (disregarding legal conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill. Sept. 6, 2019) (refusing to consider statements of fact containing legal conclusions on motion for summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) (noting, on a motion for summary judgment, that "[w]here a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement.").

Insurers Failed to Consider Reasonably Apparent and Ascertainable Facts Demonstrating
the Possibility of Coverage

Harris SOF No. 27:    Insurers shirked their responsibility under Missouri law to determine
if reasonably ascertainable facts raised the possibility that the claim against their insured would be
covered by the Policy.

**RESPONSE:**  Denied.  Paragraph 27 cites no authority in support of the assertions

therein, and the undisputed evidence set forth in the Insurer-Defendants' Statement of Undisputed

Material Facts (*see* Dkt. No. 106-1) and the responses above, demonstrates that the Insurer-

Defendants had no duty to defend.  In any event, Paragraph 27 contains legal conclusions which

should be disregarded.  *See, e.g.*, *Spivey v. Love*, No. 11-CV-327-JPG-PMF, 2013 WL 1980509,

at *3 (S.D. Ill. May 13, 2013) (disregarding legal conclusions contained in affidavit submitted in

support of motion for summary judgment); *Leach v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL

5874220, at *5 (S.D. Ill. July 15, 2019), *report and recommendation adopted as modified*, No. 16-

CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill. Sept. 6, 2019) (refusing to consider statements of

fact containing legal conclusions on motion for summary judgment); *Phillips v. Quality Terminal*

*Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) (noting, on a motion for summary judgment,

that "[w]here a party offers a legal conclusion or statement of fact without proper evidentiary

support, the Court will not consider that statement.").

Harris SOF No. 28:    Insurers' decision to deny coverage was based solely on review of
the Policy, the complaint, and the attached certificate of merit. *Deposition of Emily Anderson,* Nov.
17, 2020, 36:25, 37:1-3. Insurers' claim representative spent only 2 to 4 hours reviewing and
determining that Insurers had no duty to defend. *Id.* 48:5-16. Insurers did not ask for medical
records to aid their review. *Id.,* p.58. Insurers did not attempt to determine who authored the
certificate of merit, nor did they inquire as to the training, education, or experience of the author.
*Id.* pp.87-88; *Dep. Hilgerman,* p.97. Insurers did not determine whether sepsis can arise by any
cause other than bacteria. *Dep. Anderson,* p. 88-89. Insurers did not interview Durham regarding
bacteria or fungi or products intended for bodily consumption at the dialysis facility. *Dep.
Hilgerman,* p.110-11. Insurers did nothing to ascertain if the consumption exception might apply:

> Q.    So how do you know that in the Harris case, any alleged bacteria or fungi
>       wasn't contained in, or on, a good or product intended for bodily
>       consumption?

A.      I don't.

Q.      Well, so, in other words, the exclusion might not even apply if the bacteria
        or the fungi had been on a good or a product intende3d for bodily
        consumption, right?

A.      Potentially.

Q.      Well, and you have no clue at all as to whether or not that was the case,
        right?

A.      Right. I can only go based off of the allegations in the complaint.

Q.      Oh, but you didn't do one bit of investigation to try to find out if that was
        the case or not, right?

A.      As alleged in the complaint.

Q.      Okay. Just answer my question, if you would. You did not one bit of
        investigation to find out if that clause, which would negate the exclusion,
        applied, right?

A.      I did not look into it further.

*Dep. Anderson*. 68:18-25, 69:1-15.

**RESPONSE:** Denied for the reasons set forth in the Insurer-Defendants'

Statement of Undisputed Material Facts (*see* Dkt. No. 106-1) and the responses to Paragraph Nos.

50–51 and 103–104 (in response to the Durham Defendants' statement of facts).

In Conclusion

Harris SOF No. 29:    The complaint stated a claim a claim for bodily injurycovered by the
Policy; Insurers had the duty to defend. Even crediting Insurers' interpretation of the certificate of
merit, the claim was covered by the Policy because the consumption exception applied; Insurers
had the duty to defend. Insurers failed to make any reasonable investigation – or any investigation
at all – into the claim or into their insured's activities. The facts establishing that Liberty Mutual
InsuranceCompany and Ohio Security Insurance Company failed to show 'no possibility of
coverage' are not in dispute.

**RESPONSE:** Denied. Paragraph 29 cites no authority in support of the assertions

therein, and the undisputed evidence set forth in the Insurer-Defendants' Statement of Undisputed

Material Facts (*see* Dkt. No. 106-1) and the responses above demonstrates that the Insurer-

Defendants had no duty to defend. In any event, Paragraph 29 contains legal conclusions which

64

should be disregarded. *See, e.g.*, *Spivey v. Love*, No. 11-CV-327-JPG-PMF, 2013 WL 1980509, at *3 (S.D. Ill. May 13, 2013) (disregarding legal conclusions contained in affidavit submitted in support of motion for summary judgment); *Leach v. Shaffer*, No. 16-CV-634-JPG-RJD, 2019 WL 5874220, at *5 (S.D. Ill. July 15, 2019), *report and recommendation adopted as modified*, No. 16-CV-634-JPG-RJD, 2019 WL 4233659 (S.D. Ill. Sept. 6, 2019) (refusing to consider statements of fact containing legal conclusions on motion for summary judgment); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) (noting, on a motion for summary judgment, that "[w]here a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement.").

Dated: July 16, 2021                          Respectfully Submitted,

                                              **OHIO SECURITY INSURANCE COMPANY and LIBERTY MUTUAL INSURANCE COMPANY and THE OHIO CASUALTY INSURANCE COMPANY**

                                    By:    */s/  Matthew O. Sitzer*
                                              One of Their Attorneys

Matthew O. Sitzer (#6210083)
Matthew C. Wolfe (#6307345)
Peter F. O'Neill (#6324429)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, Illinois 60606
Telephone:  (312) 704-7700
Facsimile:  (312) 558-1195
msitzer@shb.com
mwolfe@shb.com
pfoneill@shb.com

## <u>CERTIFICATE OF SERVICE</u>

I, Matthew O. Sitzer, an attorney, hereby certify that, on **July 16, 2021**, I caused a true and complete copy of the foregoing **INSURER-DEFENDANTS' RESPONSES TO DEFENDANTS DON DURHAM AND DURHAM ENTERPRISE, INC.'S AND DEFENDANT TOMMY HARRIS' STATEMENTS OF FACT IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT** to be filed electronically. Notice of this filing will be sent to all parties below registered on this Court's CM/ECF system. Parties may access this filing through the Court's system.

Samantha Unsell
**KEEFE, KEEFE & UNSELL, P.C.**
#6 Executive Woods Court
Belleville, Illinois 62226
Telephone: (618) 236-2221
Facsimile: (618) 236-2194
Email: ashley@tqkeefe.com
            samunsell@gmail.com

*Counsel for Tommy Harris*

Ted F. Frapolli
**LAW OFFICES OF TED F. FRAPOLLI**
1714 Deer Tracks Trail, Suite 200
St. Louis, Missouri 63131
Telephone: (314) 993-4261
Facsimile: (314) 993-3367
Email: ted@tffrapollilaw.com

*Counsel for Durham Enterprises, Inc. and
Don Durham*

                                            /s/ Matthew O. Sitzer